# IN THE SUPREME COURT OF IOWA

No. 05–1641

Filed January 23, 2009

**SAM SOIFER, ESTATE OF BARBARA J. SOIFER,** Deceased,
by SAM SOIFER and JOANN ROBINSON**,** Coexecutors,
and **FRANCHISE REALTY INTERSTATE CORP.**,

    Appellants,

vs.

**FLOYD COUNTY BOARD OF REVIEW**,

    Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Floyd County, John S. Mackey, Judge.

Board of Review seeks further review of court of appeals' decision reversing district court's order dismissing taxpayers' appeal from property tax assessments. **DECISION OF COURT OF APPEALS VACATED. DISTRICT COURT JUDGMENT AFFIRMED.**

Judith M. O'Donohoe of Elwood, O'Donohoe, Stochl, Braun & Churbuck, Charles City, for appellants.

Bruce B. Green and Brett Ryan of Willson & Pechacek, P.L.C., Council Bluffs, and Kimberly L. Birch, Assistant County Attorney, Charles City, for appellee.

**TERNUS, Chief Justice.**

This case involves taxpayers' consolidated appeals from the decisions of the appellee, Floyd County Board of Review, denying the taxpayers' objections to assessments of their property for tax purposes. The property is a McDonald's fast-food restaurant located in Charles City, Iowa. It is owned by appellant, Franchise Realty Interstate Corp., who leases it to appellants Sam and Barbara Soifer,[1] McDonald's franchisees. The parties dispute the actual value of the property and the necessity of using franchise-to-franchise sales as comparable transactions in determining market value. The district court dismissed the taxpayers' appeals, ruling the assessed value of $352,990 in 2003, 2004, and 2005 was not excessive or inequitable.

On appeal, the court of appeals reversed the district court and reduced the assessed value to $230,000 for the years in question. In its de novo review, the court of appeals found more convincing the testimony of the taxpayers' expert witnesses that the market value of the property was far less than the assessed value. We granted further review. Upon our review of the record, we agree with the district court that the assessed value was not excessive or inequitable. Therefore, we vacate the court of appeals' decision and affirm the judgment of the district court.

**I. General Principles of Law Applicable to Assessment Proceedings.**

We start our discussion of this appeal with a review of the legal concepts governing valuation of real estate for taxation purposes, as we believe it is helpful to have these principles in mind before reviewing the

---

[1]After the filing of this case, Barbara Soifer died, and her estate was substituted as a party. To avoid unnecessarily complicating our discussion of this case, we will refer to Barbara Soifer, rather than to her estate, as the appellant.

background facts and prior proceedings. The relevant statutory framework for the assessment and valuation of property is contained in Iowa Code chapter 441. *See* Iowa Code ch. 441 (2005). "All property subject to taxation shall be valued at its actual value . . . ." *Id.* § 441.21(1)(*a*). "Actual value" is "the fair and reasonable market value of [the] property." *Id.* § 441.21(1)(*b*).

> "*Market value*" is defined as the fair and reasonable exchange in the year in which the property is listed and valued between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property.

*Id.* In determining market value, "[s]ales prices of the property or comparable property in normal transactions reflecting market value, and the probable availability or unavailability of persons interested in purchasing the property, shall be taken into consideration."[2] *Id.* The statute also instructs that "abnormal transactions not reflecting market value shall not be taken into account or shall be adjusted to eliminate the effect of factors which distort market value." *Id.* Although the assessor may consider any factor that "would assist in determining the fair and reasonable market value of the property," the assessor may not take into consideration "[s]pecial value or use value of the property to its

---

[2]The legislature has expressed a preference for valuations based on comparable sales. *Boekeloo v. Bd. of Review*, 529 N.W.2d 275, 277 (Iowa 1995); *accord* Iowa Admin. Code r. 701—71.5 (requiring county assessors to use "an analysis of comparable sales" to determine "the actual value of commercial real estate"). Iowa Code section 441.21 provides that "[i]n the event market value of the property being assessed cannot be readily established [through comparable sales], then the assessor may determine the value of the property using the other uniform and recognized appraisal methods." Iowa Code § 441.21(2); *see Carlon Co. v. Bd. of Review*, 572 N.W.2d 146, 149–50 (Iowa 1997) ("Thus these provisions mandate that the assessor must first attempt to determine fair market value by using comparable sales. Failing this, the assessor may then resort to the 'other factors' approach outlined in section 441.21(2)."). The parties in this case agree the actual value of the subject property can be established using the comparable-sales approach.

present owner, and the good will or value of a business which uses the property as distinguished from the value of the property as property." *Id.* § 441.21(2).

The Iowa Administrative Code requires an assessor to "classify and value property according to its present use and not according to its highest and best use."[3] Iowa Admin. Code r. 701—71.1(1). "[P]roperty subject to a lease is taxed as a whole and measured by the value of its fee." *Merle Hay Mall v. City of Des Moines Bd. of Review*, 564 N.W.2d 419, 422 (Iowa 1997).

A property owner who is dissatisfied with the county assessor's valuation may protest the assessment to the board of review. Iowa Code § 441.37(1). Among other grounds, the protest may be based on a claim "[the] assessment is not equitable as compared with assessments of other like property in the taxing district" or on a claim "the property is assessed for more than the value authorized by law." *Id.* § 441.37(1)(*a*), (*b*).

If the property owner is not content with the board's disposition of the protest, the taxpayer may appeal to the district court. *Id.* § 441.38(1). Although the taxpayer is limited to the grounds raised before the board, the taxpayer may introduce evidence in the district court to sustain those grounds. *Id.* The district court hears the appeal in equity and "determine[s] anew all questions arising before the board." *Id.* § 441.39. There is no presumption "as to the correctness of the valuation of assessment" from which the appeal is taken. *Id.*

---

[3]Contrary to this rule, the appraisers in this case, including the county assessor, testified they valued the subject property at its highest and best use. Our decision is not affected by the conflict between the controlling rule, focusing on present use, and the experts' opinions, focusing on highest and best use, because the witnesses agreed the highest and best use for the property was its present use as a franchise restaurant.

If the property owner " 'offers competent evidence by at least two disinterested witnesses that the market value of the property is less than the market value determined by the assessor,' the burden shifts to the board of review to uphold the assessed value." *Boekeloo v. Bd. of Review*, 529 N.W.2d 275, 277 (Iowa 1995) (quoting Iowa Code § 441.21(3) (1993)). If the taxpayer fails to offer competent evidence of two disinterested witnesses, then the burden of persuasion remains with the taxpayer to establish that the assessed valuation was excessive. *Id.* at 279; *Foreman & Clark of Iowa, Inc. v. Bd. of Review*, 286 N.W.2d 169, 172 (Iowa 1979). When a property owner claims the valuation was excessive, in addition to proving the excessiveness of the board's valuation, the property owner must establish the correct valuation. *Heritage Cablevision v. Bd. of Review*, 457 N.W.2d 594, 598 (Iowa 1990); Iowa Code § 441.21(3).

Having in mind this general introduction to the statutory scheme governing property assessments and appeals from them, we turn now to the facts of this case.

## II. Background Facts and Proceedings.

Sam and Barbara Soifer own a franchise for a McDonald's restaurant located in Charles City, Iowa. The building and the real estate upon which it sits is owned by a McDonald's company known as Franchise Realty Interstate Corp. The Soifers lease the property from Franchise Realty, and under the agreement, are responsible for payment of the property taxes on the parcel.

The building on the property was constructed in 1978 and has undergone periodic modifications, enlargements and updating since that time. The property is located in a 100-year floodplain and was flooded in 1993, 1996, 1999, and 2004. Due to the floodplain location, the property insurance premium includes a $4000 surcharge. Although the

restaurant is just off the main commercial street going through Charles City known as Old Highway 218, it has no frontage on this street. Moreover, in July 2000, the Avenue of the Saints, an interstate highway, opened. This interstate bypasses Charles City, causing traffic that would normally take Old Highway 218 through Charles City to travel around Charles City on the new interstate. The rerouting of traffic has caused a drop in business along Old Highway 218. The Soifers claim a twenty-five-percent decrease in gross sales receipts since the opening of the interstate, and an additional ten-percent drop since the opening of another fast-food restaurant directly off the bypass exit. Nonetheless, the Soifers and their appraiser acknowledge this McDonald's restaurant continues to be a very viable establishment.

In 2001, the county assessor raised the assessment on the property from $356,000 to $399,000 after conducting a complete market analysis to re-evaluate all commercial properties in the taxing district. After an appeal, the Board reduced the assessed value to $368,650, and in an out-of-court settlement, the valuation was reduced even further to $351,780. In 2002, the assessment was again raised, this time to $352,990 for 2003 and 2004. Upon the Soifers' protest, the Board upheld the assessment. During the pendency of an appeal of the 2002 assessment, another assessment occurred resulting in the same assessed value of $352,990. The taxpayers unsuccessfully protested and then appealed the subsequent assessment as well, and both appeals were consolidated.

In the consolidated appeals for tax years 2003, 2004, and 2005, the Soifers challenged the assessments on two grounds. First, they asserted the actual value of their property was $250,000, not $352,990. Second, they claimed the assessments of their property were not

equitable when compared with the assessments of like properties in the city.

In the district court proceedings, the Soifers introduced the expert testimony of an appraiser, Brett Blanchfield, and a local realtor, Connie Parsons. Blanchfield placed the value of the property at $230,000, and Parsons opined the value was between $193,000 and $217,500. The Board presented the testimony of the county assessor and Robert Ehler, an appraiser who testified the reasonable market value of the property was $381,000.

The district court concluded all three experts' opinions were flawed. Although Ehler, the Board's appraiser, used franchise-to-franchise sales as comparable transactions, which the court believed more fairly and accurately reflected the fair market value of the subject property, Ehler failed to adequately account for local market conditions in evaluating these comparable sales. The taxpayers' appraiser, Blanchfield, considered local market conditions, but did not use franchise-to-franchise sales as his comparables. The court found that,

> [t]o obscure the fact that this real estate is being operated as a viable McDonald's restaurant, a quite popular American establishment, would be to ignore reality. . . . It would be commonly inferred that a willing buyer would reasonably expect to pay, and a willing seller would reasonably expect to receive, a premium for such a sale.

The court concluded the best indicator of the fair market value of the property was the figure to which the parties agreed in July 2002, $351,780. The court noted the assessment of $352,990 fell between the parties' agreed-upon figure of $351,780 and a random appraisal done by the Department of Revenue and Finance that established a market value

of $353,390.[4]  The court concluded, therefore, that the assessment was not excessive.  The court also ruled the taxpayers had failed to prove the assessment was inequitable, as they had not shown there were comparable properties within the assessment jurisdiction assessed at a lower ratio of assessed value to actual value.

The taxpayers appealed, and their appeal was transferred to the court of appeals.  In its de novo review, the court of appeals rejected the Board's contention that the taxpayers had not offered "competent evidence of two disinterested witnesses" because the taxpayers' experts had not used franchise-to-franchise sales.  The court of appeals concluded the Soifers had proved the Board's assessments were excessive and that the Board had not adequately rebutted this proof. The court discounted the testimony of the Board's appraiser for two reasons:  (1) Ehler had not quantified the adjustments he made to sales of comparable properties, and (2) "Ehler's use of only franchise-to-franchise sales resulted in the prohibited inclusion of good will in the valuation of the McDonald's property."  We granted the Board's application for further review.

### III.  Scope and Standard of Review.

Our review of the district court's decision is de novo.  *Riley v. Iowa City Bd. of Review*, 549 N.W.2d 289, 290 (Iowa 1996).  Although we give weight to the fact-findings of the trial court, particularly with respect

---

[4]The department conducts random appraisals of commercial properties "to determine the aggregate actual valuation of commercial real estate in each assessing jurisdiction."  Iowa Admin. Code r. 701—71.12(3).  This determination is part of a process that culminates in an order by the director of revenue to equalize "the levels of assessment of each class of property in the several assessing jurisdictions."  Iowa Code § 441.47.  *See generally Office of the Assessor v. Iowa Dep't of Revenue*, 417 N.W.2d 214 (Iowa 1987).

to the credibility of the witnesses, we are not bound by those findings. Iowa R. App. P. 6.14(6)(*g*).

**IV. Did Taxpayers Introduce Competent Evidence of Value From Two Disinterested Witnesses?**

In order to establish which party has the burden of proof, we must first determine whether the Soifers introduced "competent evidence by at least two disinterested witnesses that the market value of the property is less than the market value determined by the assessor." Iowa Code § 441.21(3). There is no dispute that the taxpayers' expert witnesses, Blanchfield and Parsons, are disinterested. *See Post-Newsweek Cable, Inc. v. Bd. of Review*, 497 N.W.2d 810, 813 (Iowa 1993) (defining a "disinterested witness" as "[o]ne who has no right, claim, title, or legal share in the cause or matter in issue, and who is lawfully competent to testify"). The fighting issue is whether they offered "competent evidence."

The statutory requirement of "competent evidence" means "that the testimony of the disinterested witnesses must comply with the statutory scheme for property valuation for tax assessment purposes." *Boekeloo*, 529 N.W.2d at 279. If it does not comport with the statute, the evidence is not relevant and is, therefore, inadmissible. *See Ross v. Bd. of Review*, 417 N.W.2d 462, 465 (Iowa 1988); *cf. Johnson v. Iowa Dist. Ct.*, 756 N.W.2d 845, 850 n.4 (Iowa 2008) (stating "[c]ompetent evidence means admissible evidence"). Chapter 441 requires that the comparable-sales approach be used unless market value cannot be established under this method of valuation. Iowa Code § 441.21(2). As noted earlier, the parties' experts agreed the market value of the subject property could be determined using the comparable-sales approach.

We have held that market-value testimony by a taxpayer's witnesses under a comparable-sales approach is "competent" only if the

properties upon which the witnesses based their opinions were comparable. *Boekeloo*, 529 N.W.2d at 279; *Bartlett & Co. Grain v. Bd. of Review*, 253 N.W.2d 86, 88 (Iowa 1977) (stating "if the taxpayers do not so persuade the fact finder as to comparability, then the fact finder cannot consider the sales prices of those other [properties] or the experts' opinions predicated on [those sales prices,]" "in determining the [market value] of the subject [property]"). In addition, the property owner is "required to offer a sufficient factual basis for the [witnesses'] opinions to take them out of the realm of mere speculation and conjecture." *Riso v. Pottawattamie Bd. of Review,* 362 N.W.2d 513, 518 (Iowa 1985) (citing *Osborn v. Massey-Ferguson, Inc.*, 290 N.W.2d 893, 899 (Iowa 1980)). In other words, "if any element of the ground of protest [is] not supported by substantial evidence, the foundation would be insufficient to support an expert opinion on the ultimate issue," and consequently, the witness's testimony would not constitute "competent evidence." *Id.*

The issue of comparability has two facets: the property offered for comparison must be "comparable" and the sale of that property must be a "normal transaction." *See* Iowa Code § 441.21(1)(*b*) (referring to the sales prices of "comparable property in normal transactions"); *Equitable Life Ins. Co. v. Bd. of Review*, 281 N.W.2d 821, 823 (Iowa 1979) (stating "sales price approach depends upon the availability of sales prices of the property or comparable property in normal transactions"). To determine whether other properties are sufficiently comparable to be used as a basis for ascertaining market value under the comparable-sales approach, we have adopted the rule that the conditions with respect to the other land must be "similar" to the property being assessed. *Bartlett & Co. Grain*, 253 N.W.2d at 93. As we stated in *Bartlett & Co. Grain*, " '[s]imilar does not mean identical, but having a resemblance; and

property may be similar . . . though each possess various points of difference.'" *Id.* (quoting *Redfield v. Iowa State Highway Comm'n*, 251 Iowa 332, 341, 99 N.W.2d 413, 418 (1959)).

Whether other property is sufficiently similar and its sale sufficiently normal to be considered on the question of value is left to the sound discretion of the trial court. *See id.* at 94. Factors that bear on the competency of evidence of other sales include, with respect to the property, its "[s]ize, use, location and character," and, with respect to the sale, its nature and timing. *Crozier v. Iowa-Ill. Gas & Elec. Co.*, 165 N.W.2d 833, 834 (Iowa 1969).[5] When sales of other properties are admitted, the market value of the assessed property must be adjusted to account for differences between the comparable property and the assessed property to the extent any differences would distort the market value of the assessed property in the absence of such adjustments. Iowa Code § 441.21(1)(*b*); *Bartlett & Co. Grain*, 253 N.W.2d at 88; *Dowden v. Dickinson County Bd. of Review*, 338 N.W.2d 719, 723 (Iowa Ct. App. 1983). In addition, if the sale itself is an "abnormal transaction[]," the market value must "be adjusted to eliminate the effect of factors which distort market value." Iowa Code § 441.21(1)(*b*) (listing as distorting factors "sales to immediate family of the seller, foreclosure or other forced sales, contract sales, discounted purchase transactions or purchase of adjoining land or other land to be operated as a unit"); *accord Foreman & Clark of Iowa, Inc.*, 286 N.W.2d at 172–73 (requiring adjustment for

---

[5]Although *Crozier* is a condemnation case, the principles regarding valuation of property for purposes of condemnation are to a great extent the same as those governing valuation for assessment purposes. *See generally Bartlett & Co. Grain*, 253 N.W.2d at 93 (using definition of comparable property from condemnation case in tax assessment case); *Vine St. Corp. v. City of Council Bluffs*, 220 N.W.2d 860, 862 (Iowa 1974) (holding evidence of assessed value of condemned property was relevant in condemnation proceeding because both valuations were based on the "[f]air and reasonable market value" of the property).

abnormal contract sale). If distorting sale factors or the points of difference between the assessed property and the other property are not quantifiable so as to permit the required adjustment, the other property will not be considered comparable. *See Bartlett & Co. Grain*, 253 N.W.2d at 94 (rejecting comparability of property that differed from subject property "because of insufficient evidence to enable us to translate that difference into dollars of value").

In the present case, the Board claims the only comparable properties are those being used for a franchise restaurant and the only sales that reflect the value of this use are sales of such properties to sellers who plan to continue the franchise use. The Board argues that a franchise property has "architectural appeal, that is, a design that the general public recognizes." It claims there is value in this architecture that is captured only when the sale is a franchise-to-franchise sale. The taxpayers contend for a broader interpretation of "similar," one that would include, as comparable properties, those used for restaurant purposes in general, not only fast-food, franchise restaurants. They also argue sales of franchise property for uses other than continuation of the franchise are probative of the market value of franchise property and, therefore, a competent basis for expert opinion.

The first issue we must address is whether *only* other franchise properties sufficiently resemble the Soifers' property so as to provide an adequate factual foundation for a comparable-sales valuation. It cannot credibly be disputed that properties used for the operation of a fast-food, franchise restaurant would, in the absence of other significant differences, be most similar to the property being assessed in this case. As noted above, property is to be valued based on its "present use," Iowa Admin. Code r. 701—71.1(1), and the present use of this property is a

fast-food, franchise restaurant. But that fact does not necessarily mean nonfranchise, one-of-a-kind restaurants are not "similar" to fast-food, franchise restaurants. We find guidance in our *Crozier* opinion.

In *Crozier*, the issue was the market value of a farm "used for plaintiffs' unique and financially rewarding wilderness hog farrowing operation." 165 N.W.2d at 834. The property owner challenged the defendant's expert's testimony regarding sales of comparable property, asserting there was not sufficient similarity between the comparable property and the subject farm because the comparable properties did not have a wilderness hog farrowing operation. *Id.* We held the trial court did not abuse its discretion in admitting evidence of these sales because the comparable properties were farms that were similar "in size, use, location and character" to the subject property, even though they did not have a wilderness hog farrowing operation. *Id.* at 835. We considered the absence of a wilderness hog farrowing operation on the comparable properties a mere "difference in operation [that went] to the weight and credibility of the sales as comparable rather than to their admissibility." *Id.*

The Iowa Court of Appeals reached a similar conclusion in concluding "the difference between a large anchor store space and small retail shop space in a shopping mall" did not render a sale of shopping mall space occupied by a series of smaller tenants inadmissible to establish the value of space occupied by a large anchor tenant. *Sears, Roebuck & Co. v. Sieren*, 460 N.W.2d 887, 890 (Iowa Ct. App. 1990). Although the court rejected the taxpayer's "argument that because of this difference the properties are not comparable sales," the court noted the difference was "one factor to consider" in weighing the evidence. *Id.*

We think the approach followed in Iowa in admitting evidence of comparable sales is accurately reflected in the following statement from a sister state: "[W]here the properties are reasonably similar, and a qualified expert states his opinion that they are sufficiently comparable for appraisal purposes, it is better to leave the dissimilarities to examination and cross-examination than to exclude the testimony altogether." *Stewart v. Commonwealth*, 337 S.W.2d 880, 884 (Ky. Ct. App. 1960). As this court has recently noted in a different context, a requirement that evidence be competent does not mean that it must be credible. *Johnson*, 756 N.W.2d at 850 n.4. Consequently, in determining whether the Soifers offered competent testimony from two disinterested witnesses, we examine whether this evidence was admissible on the question of value, not whether we find it persuasive.

The expert testimony offered by the taxpayers in this case was based on sales of properties that were used for restaurant purposes, but not for fast-food, franchise restaurants. We conclude this evidence was admissible and competent. Because other properties need not be identical to qualify as comparable, we think it follows that the *use* of other properties need not be identical. Here, a restaurant use is sufficiently similar to a fast-food, franchise restaurant use to be considered comparable. Nonetheless, a difference in use does affect the persuasiveness of such evidence because "as differences increase the weight to be given to the sale price of the other property must of course be correspondingly reduced." *Bartlett & Co. Grain*, 253 N.W.2d at 93; *accord Crozier*, 165 N.W.2d at 835. In other words, all else being equal, evidence of sales of nonfranchise restaurant properties is not as probative of the value of franchise-restaurant property as is evidence of sales of other franchise-restaurant properties.

Blanchfield used four sales in his comparable-sales analysis. The properties that were the subject of these sales were located in Charles City, Fort Dodge, Storm Lake, and Marshalltown, Iowa, and all had buildings originally used as franchise restaurants. Three of the properties were sold for use as nonfast-food, franchise restaurants and the fourth property was sold to a bank that tore down the restaurant building and replaced it with a bank building. Blanchfield made adjustments to the sales prices of these properties based on differences in access, building age and condition, building quality, site improvements, and land-to-building ratio. The adjusted sales prices of these properties indicated a market value of the Soifers' property within a range of $197,966 to $244,178. Stating he placed greatest weight on sales one and four, Blanchfield concluded the subject property had a value of $230,000. He testified his conclusion was supported by his cost analysis that resulted in a market value of $232,000.

Realtor Parsons also used a comparable-sales approach. She concluded the Soifers' property had a market value of $217,500 based on her analysis of sales of other commercial properties in Charles City. Parsons testified to the differences between the other commercial properties and the Soifers' property and the impact of those differences on the value of the subject real estate. She did not, however, explain the calculations she employed to determine a market value nor did she otherwise quantify any adjustments she made to the sales prices of the other properties to reach a market value for the Soifers' property.

We conclude Blanchfield and Parsons complied with the statutory scheme for property valuation for tax assessment purposes in offering opinions on the value of the Soifers' property based on the comparable-sales approach and that the comparable properties upon which they

relied were sufficiently similar to support admission of their testimony. Because the taxpayers introduced competent evidence by two disinterested witnesses that the market value of the subject property is less than the market value determined by the assessor, the burden shifts to the Board to uphold the assessed value. *Boekeloo*, 529 N.W.2d at 277.

**V. Did the Board Sustain Its Burden of Proof?**

Four witnesses gave opinions of the market value of the Soifers' property. The Board called one expert, appraiser Ehler, and introduced the testimony of the Floyd County assessor, Bruce Hovden. The taxpayers presented two expert witnesses, appraiser Blanchfield and realtor Parsons. For the reasons we now discuss, we find the Board's evidence more persuasive than that of the taxpayers. We will address the testimony of each witness separately.

**A. Appraiser Ehler.** The Board presented testimony from appraiser Robert Ehler that the assessed property had a market value of $381,000. Although Ehler made value calculations using the comparable-sales, income and cost methods, he based his opinion on the comparable-sales approach. He relied on the sale of eight properties used for fast-food, franchise restaurants sold to buyers who continued to use the property for the same or another fast-food, franchise restaurant.

**1. Franchise-to-franchise sales.** The Soifers' expert criticized Ehler's reliance on only franchise-to-franchise sales, asserting such sales inappropriately included "some kind of intangible business value." An assessor can "consider intangibles in arriving at the actual value of the taxable property" provided the intangibles specified in section 441.21(2) are not considered. *Merle Hay Mall*, 564 N.W.2d at 423. As we noted above, section 441.21(2) specifically prohibits the assessor from considering "[s]pecial value or use value of the property to its owner, and

the good will or value of a business which uses the property as distinguished from the value of the property as property."[6]  Iowa Code § 441.21(2).  There is certainly a tension between valuing property based on its present use and yet avoiding the inclusion of prohibited intangibles.  A review of some of our prior cases addressing this issue illuminates where the fine line between these two concepts lies.

In *Heritage Cablevision v. Board of Review*, 457 N.W.2d 594 (Iowa 1990), the taxpayer challenged an assessment of *real property* used for the operation of a cable television system.  The board's expert had used sales of cable television *systems* as the basis for his comparable-sales valuation.  *Heritage Cablevision*, 457 N.W.2d at 598.  This court agreed with the trial court's observation that the value of the entire system necessarily included nontaxable assets such as a franchise to operate, the value of the business, and goodwill.  *Id.*  Although the expert had attempted to make adjustments for the inclusion of prohibited intangibles in the sales prices of the comparable properties, we

---

[6]We have adopted "a narrow interpretation of the special-use exclusion." *Merle Hay Mall*, 564 N.W.2d at 425.

> Special value or use of the property to its present owner means "sentiment, taste, or other factors, frequently subjective [which] give property peculiar value or use to its owner that it does not have to others."  "Features and fancies" added to a homestead for the personal delight of the owner but of no use or value to others are examples of special value or use that are not to be considered in valuation.

*Riso*, 362 N.W.2d at 516 (quoting *Maytag Co. v. Partridge*, 210 N.W.2d 584, 591 (Iowa 1973)).  Thus, if improvements can be sold to and used by a purchaser, their value should not be excluded.  *Merle Hay Mall*, 564 N.W.2d at 425.  Here, the configuration of the building and its placement on the site give this property value for use as a fast-food restaurant.  This value is not peculiar to the present owner.  It would also have use and value to a purchaser of the property.  *See Equitable Life Ins. Co.*, 281 N.W.2d at 825 (rejecting taxpayer's argument assessor had included special use or use value of the property to its present owner in his valuation, concluding use of building by insurance company was not unique and building "could readily be used by any large enterprise desiring to house its home office under one roof"); *Maytag*, 210 N.W.2d at 591 (same).  Accordingly, "[s]pecial value or use value of the property to its owner" is not implicated in this case.  Iowa Code § 441.21(2).

concluded his calculation of market value under the income and cost approaches revealed that a much larger adjustment would have been appropriate. *Id.* at 599. Therefore, we rejected the comparable-sales component of the witness's testimony. *Id.*

In our subsequent *Merle Hay Mall* case, the taxpayer claimed the assessor had inappropriately included intangible business value in his assessment, "such as the worth of the business organization, management, the assembled work force, working capital, and legal rights such as trade names, franchises, and agreements, that have been assembled to make a business a viable entity." 564 N.W.2d at 423. We disagreed with the taxpayer that a reduction in the valuation was necessary to account for such intangibles and distinguished our *Heritage Cablevision* case. *Id.* at 424. We noted that, with the exception of the intangibles removed from valuation by statute, "intangibles may be considered in valuing the real estate with which they are associated." *Id.*

This court addressed a similar issue in *Maytag Co. v. Partridge*, 210 N.W.2d 584 (Iowa 1973). Although the *Maytag* case concerned a tax valuation of the Maytag plant under the other-factors approach, our holding in that case is consistent with our resolution of the taxpayer challenge in *Merle Hay Mall*. 210 N.W.2d at 590. In *Maytag*, the taxpayer argued that, in considering the use to which the subject property was put, the assessor improperly included goodwill or value of the business. *Id.* We rejected this argument stating:

> When an assessor considers the use being made of property, he is . . . recognizing the effect of the use upon the value of the property itself. He is not adding on separate items for good will, patents, or personnel.

*Id.*

Our holding in these cases is consistent with an early case in which the taxpayer challenged the assessor's valuation of an electric light plant on the basis it included the value of the taxpayer's franchise. *Lake City Elec. Light Co. v. McCrary*, 132 Iowa 624, 625, 110 N.W. 19, 19 (1906). Although we held this argument was essentially a claim of excessive valuation that should have been made in an appeal to the board of review, we offered the following observation:

> Indeed, we think that the existence of the franchise and the fact that the light plant was a going concern instead of a mere aggregation of dead material were matters which the assessor was entitled to consider in appraising the property, and that such valuation is in no manner inconsistent with the general proposition that the franchise as such is not a taxable item of property.

*Id.* at 626–27, 110 N.W. at 20; *accord City Council v. Cedar Rapids & M.C. Ry.*, 120 Iowa 259, 266, 94 N.W. 501, 503 (1903) (stating "we think that the value of the franchise held by the corporation . . . is not the subject of assessment under the statute as it exists; but we see no reason why the fact that the railway is in successful operation, earning money for its owners, may not properly be considered by the assessor in estimating its value").

We think the fast-food restaurant property at issue here is similar to the properties housing viable commercial enterprises assessed in our *Merle Hay Mall*, *Maytag*, and *Lake City Electric* cases. Ehler testified the business itself—including the prohibited intangibles of goodwill and the value of the business using the property—is usually sold separately from the real estate. *Cf. Riso*, 362 N.W.2d at 516–17 (holding percentage rent used in income-approach valuation was not shown to be based on goodwill because McDonald's and Burger King "are separately compensated for the use of their name and other factors in franchise

agreements"). Moreover, according to Ehler, even when both the real property and the business are sold in one transaction, a portion of the purchase price is allocated to the nonreal estate assets. He said the sales he used were of real estate only. He also pointed out that his calculations of value under the income and cost methods supported his comparable-sales figure. Ehler's actual value under an income approach was $850,000, and he testified the difference between this figure and the $381,000 market value under the sales approach represented the business value of the McDonald's restaurant. *See Post-Newsweek Cable, Inc.*, 497 N.W.2d at 817 (stating difference between value determined under income approach and much lower value determined under cost approach suggested nontaxable assets were included in income-method valuation). Ehler's actual value using the cost approach was only $500 less than the value he calculated under the sales method, which, he testified, demonstrated the accuracy of the adjustments and assumptions underlying his comparable-sales valuation. We conclude based on the record in this case that Ehler's use of franchise-to-franchise sales did not include prohibited intangibles.

The taxpayers challenge Ehler's use of franchise-to-franchise sales for the additional reason that McDonald's requires buyers of McDonald's properties to agree to a noncompete clause that prevents use of the property for a fast-food franchise restaurant for twenty years. Therefore, the taxpayers claim, the actual market value of this property is more accurately reflected by sales of franchise properties to buyers who will use the property for general restaurant purposes. Such sales would reflect a lower market value, argue the Soifers, because the McDonald's architecture and the fast-food set-up would have no value to such a buyer.

While there is superficial appeal to this argument, valuing the Soifers' property as if it were not a viable McDonald's would be contrary to the principle that assessed property is valued based on its present use, including any functioning commercial enterprise on the property. In *Riso,* this court held that an assessor is "entitled to consider the use of the [assessed] property as a going concern." 362 N.W.2d at 517; *accord Maytag Co.*, 210 N.W.2d at 590; *Lake City Elec. Light Co.*, 132 Iowa at 626–27, 110 N.W. at 20. As we stated in *Maytag*, "[w]hen an assessor considers the use being made of property, he is merely following the rule that he must consider conditions as they are." 210 N.W.2d at 590 (rejecting an expert's analysis that valued machinery in use in the Maytag factory based on the used machinery market price).

Our discussion in *Riso* is particularly enlightening because *Riso* addressed the valuation of a McDonald's property and a Burger King property. 362 N.W.2d at 515. In *Riso*, the experts used cost and income methods for valuation. *Id.* at 516. Under the income approach, the assessor considered both the base rent paid by the McDonald's and Burger King lessees, as well as additional rent payments measured by a percentage of gross sales over a certain figure. *Id.* at 515–16. The district court had concluded the assessor could not rely on the percentage rent because it constituted "special use or good will value of the property that was precluded from consideration by section 441.21(2)." *Id.* at 516. This court disagreed and observed, "That substantial revenues will be generated by any of the leading fast-food restaurants of the kind involved here is no surprise. Those revenues are largely a product of the use of the property in the contemplated manner." *Id.* at 517. We concluded the assessor's use of percentage rent in determining value under the income method was appropriate because

the percentage rent reflected the value of the property as a going concern. *Id.*

Similarly, here, franchise-to-franchise sales of similar properties reflect the value of the property in its present use as a franchise restaurant. To eliminate such sales because McDonald's insists on noncompete clauses when selling its properties would ignore the requirement that real estate be valued based on its present use.

In addition, our cases do not support a reduction in market value based on a property owner's self-imposed restrictions. In *Merle Hay Mall*, the taxpayer argued the assessor failed to consider the fact that no willing buyer would offer full price for the mall property because it was subject to a very unfavorable lease to Younkers, one of the anchor tenants. 564 N.W.2d at 422. We pointed out that both the lessee's and lessor's interests are included in the valuation and, while the lease was unfavorable to the mall owner, it was very favorable to Younkers. *Id.* Therefore, we concluded, "the combined value of the parties' interests . . . remains the same." *Id.* We held the assessor, who valued the property under an income capitalization approach, "properly used the objective rental income value of the Younkers store, rather than the actual lease amount, to establish a valuation." *Id.* at 423.

We think a similar rationale applies even more forcefully here where the restriction that potentially negatively impacts a sales price is self-imposed. The property at issue in this case is a functional fast-food restaurant. Objectively, in the absence of McDonald's desire not to sell to a competing business, the building would have value to a potential buyer who desires to continue this use of the property. As already noted, it is this going-concern value that our statute seeks to capture in a comparable-sales analysis. It would be contrary to legislative intent to

allow a taxpayer to circumvent the statutory scheme by voluntarily eliminating buyers who would use the property in the same manner, thereby artificially reducing the potential sales price of the property. For this reason, we think Ehler's use of franchise-to-franchise sales was entirely proper notwithstanding limitations McDonald's may choose to impose when it sells the property.

**2. Adjustments for points of difference.** A second criticism of Ehler's testimony has more merit. Ehler made adjustments to the sales prices of his comparable properties to account for differences between them and the appraised property, but could not describe the precise adjustments he made. His report, which was admitted into evidence, also failed to quantify his adjustments, and he did not bring his working papers with him when he testified. The absence of evidence of the specific adjustments made by Ehler makes an informed evaluation of the credibility of Ehler's comparable-sales valuation difficult. If Ehler's opinion had been offered to support an actual value equal to his valuation of $381,000, we would be more concerned about the precision of his adjustments. But because the Board adopted the assessor's valuation of $352,990, almost $30,000 less than Ehler's valuation, there is some margin for error in Ehler's calculations.

The witnesses appear to have agreed that one of the most prominent factors that affected the value of the subject property was its location some distance from the new bypass. The availability of buyers who would be interested in purchasing a fast-food restaurant in this location is an important factor in establishing market value. *See* Iowa Code § 441.21(1)(*b*). Even if we assume, however, that Ehler made no adjustment for this factor or an inadequate adjustment, his opinion still substantiates the Board's valuation. Blanchfield, the Soifers' expert,

made a five-dollar per square foot adjustment in the sales price of one of the comparable properties he used to account for the poor location of the subject property on Old Highway 218. If we reduce Ehler's per-square-foot value for the subject property by the same five-dollar adjustment, Ehler's comparable-sales valuation is approximately $361,000, still well above the assessed value of $352,990. In addition, we find merit in Ehler's testimony that the similar value he calculated under the cost approach validated the unspecified adjustments he made in arriving at a value based on comparable sales. *See Heritage Cablevision*, 457 N.W.2d at 598 ("The advantage of using multiple appraisal techniques lies primarily in those instances where the differing techniques lead to similar conclusions concerning market value and therefore tend to support each other."). In summary, we think Ehler's testimony corroborates the Board's valuation, notwithstanding his failure to specify the adjustments he made to the sales prices of comparable properties.

**3. Timing of sales.** Finally, Ehler's opinion is also challenged on the basis that the sales upon which he relied occurred between 1997 and 1999, prior to the assessment years at issue in this case. Notably, the statute does not require that comparable sales occur within a certain time period of the assessment year. Moreover, adjustments can be made for changes in the market over time. *See Equitable Life Ins. Co.*, 281 N.W.2d at 826 (considering comparable sale that occurred six years prior to year of assessment, noting adjustments in the sale price were made "for time"). In the present case, Ehler testified he made no adjustment for the timing of the comparable sales because he believed the market had been relatively stable from the late 1990s through the appraisal date. The taxpayers introduced no evidence that the market was not relatively stable during this period. On balance, we do not find the

timing of Ehler's comparable sales to substantially detract from the credibility of his valuation.

**B. County Assessor Hovden.** The county assessor testified generally to his valuation of the property at $352,990. He also explained that the Department of Revenue and Finance conducts random appraisals to spot-check whether the valuations made by county assessors reflect market value. Coincidentally, the Soifers' property was the subject of such a random appraisal by the department in the general time frame at issue here. The department's appraisal produced a market value of $353,390, $400 higher than the county assessor's valuation. We think the department's nearly identical valuation is persuasive corroboration of the market value determined by the assessor.

**C. Appraiser Blanchfield.** There are several reasons we find Blanchfield undervalued the Soifers' property. Blanchfield used the sales of four comparable properties as the basis for his $230,000 valuation. He determined the price per square foot at which the properties sold and then made adjustments to this square-foot value based on differences between the comparable properties and the subject property. This process resulted in a per-square-foot value from a low of $49.05 based on comparable one to highs of $59.50 based on comparable four and $60.50 based on comparable three. Extrapolating from these square-foot values, Blanchfield computed a market value of the subject property within a range of $197,966 to $244,178. Applying his professional judgment and placing greatest weight on sales one and four, Blanchfield formed the opinion that the value per square foot for the Soifers' property was $57, producing a market value of $230,000.

These calculations resulted in an undervaluation of the Soifers' property, however, due to an error in the square footage attributed to the

building sold in sale four. The size of this building was overstated, which caused Blanchfield to calculate a lower square-foot value and a correspondingly lower market value for the subject property. Ehler testified that, had the correct square footage been used by Blanchfield, the square-foot value of sale four would have been $84.01 rather than $59.50, and the adjusted market value for the Soifers' property based on sale four would have been $340,000 rather than $240,000. Clearly, given the fact Blanchfield placed greatest reliance on sales one and four in valuing the subject property, it is reasonable to conclude that, had he used the correct square footage for comparable four, he would have placed a much higher market value on the Soifers' property.

In addition, even using the corrected figures for sale four arguably results in an undervaluation of the subject property because comparable property four was not sold as a restaurant. Rather, the buyer tore down the franchise-restaurant building that had operated as a McDonald's and replaced it with a bank. Thus, sale four did not reflect a present-use value for the property because the buyer did not intend to use the building on the property as a fast–food restaurant. Common sense tells us the building on the property was, therefore, a liability that depressed the sales price, not an asset as it would be if the property were purchased with the intent of continuing the operation of a fast-food restaurant.

Similar factors cause us to discount the value of the other three sales upon which Blanchfield relied. Sales one, two, and three were at one time operated as a Hardee's, a Kentucky Fried Chicken, and a McDonald's. None of these properties continued to be used as a fast–food restaurant after their sale. Therefore, the sales prices did not completely capture the value of the properties in their present use.

Accordingly, we conclude Blanchfield's opinion based on comparable sales understated the value of the Soifers' property.

Blanchfield's cost approach valuation was also flawed. The cost approach is based on the principle that a purchaser would pay no more for developed property than the cost of developing a new property. Under this approach, an appraiser determines the cost of developing a new property like the subject property and then applies a depreciation factor. The factor of depreciation is the difference in value between a new building and an old structure. Blanchfield used the *Marshall and Swift Valuation Services Guide* to determine replacement cost. Using this guide, he arrived at a forty-three percent depreciation factor and an ultimate determination of fair market value under the cost approach of $232,000.

The Board correctly points out that the county assessor is required by law to use a state appraisal manual prepared by the director of the department of revenue. *See* Iowa Code § 421.17(17) (placing duty on director "[t]o prepare and issue a state appraisal manual which each county and city assessor shall use in assessing and valuing all classes of property in the state"). This manual, known as the *Iowa Real Property Appraisal Manual*, includes depreciation tables, which under the circumstances of this case would call for a depreciation factor of only twenty-nine percent. Consequently, Blanchfield's cost-approach value of $232,000 was also an understatement of the value of the Soifers' property.

**D. Realtor Parsons.** Parsons used property sales in Charles City for her comparable-sales valuation because she believed these properties were sufficiently comparable and the market for commercial property in Charles City was uniquely local and not part of a region-wide market.

Although we have determined the properties used by Parsons satisfied the threshold requirement of similarity, we are not persuaded the market for a McDonald's restaurant is uniquely local. "When from the nature of the property the market for the purchase and sale encompasses a wider area, the wider area becomes the field for investigation." *Bartlett & Co. Grain*, 253 N.W.2d at 94 (allowing evidence of sales of "other terminal elevators" that were at some distance from property being assessed); *accord Farmers Grain Dealers Ass'n v. Sather*, 267 N.W.2d 58, 62 (Iowa 1978) (rejecting argument that witness's testimony was incompetent because most of comparable grain elevators were located out of state).

In determining the appropriate geographic area that may provide a source for comparable properties, we focus on the present use of the assessed property. *See Maytag Co.*, 210 N.W.2d at 591 (holding property must be valued as it is presently being used). In the present case, that use is as a McDonald's restaurant or, more generally, as a fast-food, franchise restaurant. Therefore, the focus is on a buyer interested in purchasing a McDonald's or similar fast-food restaurant. Parsons suggested no reason that a buyer interested in operating a fast-food restaurant would restrict his or her search to Charles City, Iowa. Indeed, the Soifers own McDonald's restaurants in Oelwein, Independence, and Waverly in addition to the Charles City location.

Because we are not convinced the market for the subject property was uniquely local as asserted by this witness, we do not consider the comparable properties she used to reach an opinion on value particularly persuasive. Moreover, because Parsons limited her other sales to those occurring in Charles City, she considered no franchise-to-franchise sales in determining market value. For these reasons, we think her valuation is not entitled to as much weight as that of Ehler.

In summary, we find the valuation of the Board's witness, Ehler, to be most convincing. Because that valuation exceeded the value placed on the property by the Board, we conclude the Board has carried its burden to prove that its valuation was not excessive.

**VI. Was the Valuation Inequitable?**

The taxpayers claim their property was assessed at a higher percentage of fair market value than comparable properties in the taxing district. *See* Iowa Code § 441.37(1) (allowing taxpayer to protest assessment as "not equitable as compared with assessments of other like property in the taxing district").

> When this ground is relied on, the complainant must prove (1) that there are several other properties within the assessment district similar and comparable to the one at issue, (2) the amount of the assessments on those properties, (3) the actual value of the comparable properties, (4) the actual value of the property at issue, (5) the assessment complained of, and (6) that by a comparison the property at issue is assessed at a higher proportion of its actual value than the ratio existing between the assessed and actual valuations of the similar and comparable properties, thus creating a discrimination.

*Riso,* 362 N.W.2d at 517. As with a claim of excessiveness, if the property owner "produces competent evidence by two disinterested witnesses that the market value is too high because it is inequitable," the burden of proof shifts to the board of review. *Id.* at 518.

After reviewing the record, we conclude the taxpayers did not introduce the testimony of two disinterested witnesses that the valuation of the subject property was inequitable when compared with similar properties in Floyd County. Therefore, the burden of proof did not shift to the Board. Our review also convinces us the taxpayers did not meet their burden to prove the elements of their challenge based on the alleged inequitable assessment of their property.

**VII. Summary.**

Although the Soifers introduced the testimony of two disinterested witnesses that the assessed value placed on their property by the Board was excessive, we conclude the Board met its burden to prove the assessed value was not excessive. The Soifers did not establish the value placed on their property was inequitable when compared to comparable properties in the taxing district.

We vacate the decision of the court of appeals reducing the assessed value of the Soifers' property. We affirm the judgment of the district court finding the actual value of the subject property was the assessed value of $352,990 set by the Board.

**DECISION OF COURT OF APPEALS VACATED. DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Baker, J., who takes no part.