# IN THE COURT OF APPEALS OF IOWA

No. 22-0826
Filed March 29, 2023


**WH DEVELOPMENT, LLC, and HY-VEE, INC.,**
    Plaintiffs-Appellants,

**vs.**

**POLK COUNTY BOARD OF REVIEW,**
    Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.


        WH Development, LLC and Hy-Vee, Inc. appeal the assessed value of a Polk County property.  **AFFIRMED.**


        Richard A. Davidson and Brett R. Marshall of Lane & Waterman LLP, Davenport, for appellants.

        Kimberly Graham, Polk County Attorney, and Mark Taylor, Assistant Polk County Attorney, Des Moines, for appellee.


        Considered by Bower, C.J., and Badding and Buller, JJ.

**BOWER, Chief Judge.**

WH Development, LLC and Hy-Vee, Inc. (collectively Hy-Vee) appeal the district court's findings upholding the Polk County Board of Review's (Board) 2019 real estate assessment of a store and property in Windsor Heights.  We affirm.

**I. Background Facts & Proceedings**

The property subject of this appeal is a grocery store located in Windsor Heights.  The land consists of 7.091 acres (308,883 square feet).  The building is 67,492 square feet, with an additional 3672 square feet of finished office, training, and breakroom space on a mezzanine.  The building was built in 1997 and has since been remodeled and expanded.  The parking lot at the front of the store has 348 parking spaces, and a smaller parking area is located at the back of the store.

In 1999, Hy-Vee sold the property for $7,500,000 to UTF Windsor Heights, LLC, who executed a long-term lease to Hy-Vee.  In 2007, UTF Windsor Heights, LLC, sold the property to WH Development, LLC, for $8,200,000.  In 2014, the initial lease was extended to a thirty-year term with the potential for four five-year renewals.[1]

The January 1, 2019 tax assessment for the property was $6,310,000, a $400,000 increase from the 2018 tax assessment.[2]  Hy-Vee protested the assessment to the Board, asserting the property's actual value was $3,155,000—half the assessed value.  The Board denied the protest "because the property is

---

[1] Although the property has a long-term lease, the appraisals are done without consideration of the lease.

[2] The increase was part of a biennial appraisal of all commercial property assessments by the assessor's office under a separate statutory process.

not assessed for more than the value authorized by law." Hy-Vee appealed the assessment in district court.

Four appraisers were hired to offer opinions of the property's value. Hy-Vee hired certified appraisers Thomas Scaletty and John Olson, and the Board hired Dennis Cronk and Russ Manternach. No objections were raised as to the credentials of any of the appraisers, though each side argued the other's experts failed to follow the statutory scheme. Each expert analyzed the property using three commonly-used valuation methods—comparable sales, cost, and income— and then gave a final opinion of the property's value.

| Appraiser | Comparable Sales Approach | Cost Approach | Income Approach | Final Opinion of Value | Per Sq. Foot |
|---|---|---|---|---|---|
| Scaletty | $4,050,000 | $4,040,000 | $4,030,000 | $4,050,000 | $60 |
| Olson | $4,050,000 | $4,550,000 | $4,135,000 | $4,135,000 | $60 |
| Cronk | $6,190,000 | $6,310,000 | $5,870,000 | $6,150,000 | $87[3] |
| Manternach | $6,410,000[4] | $6,720,000 | $6,750,000 | $6,600,000 | $95 |

After analyzing the evidence submitted, the court affirmed the Board's ruling, stating, "The [Board]'s evidence through its experts . . . is sufficient to sustain its burden to uphold that assessment by a preponderance of the evidence."

Hy-Vee appeals, requesting a valuation between $4,660,000 and $5,210,000.

---

[3] Cronk included the mezzanine space in his appraisal calculations; the other three appraisers calculated using the general square footage of 67,492.
[4] Hy-Vee's briefing inexplicably states Manternach's appraisal values are $470,000 to $650,000 higher than those found in the record before us.

## II. Standard of Review

"Our review of a tax protest is de novo. '[W]e give weight to the [district] court's findings of fact, [but] we are not bound by them.' We are especially deferential to the court's assessment of the credibility of witnesses." *Wellmark, Inc. v. Polk Cnty. Bd. of Rev.*, 875 N.W.2d 667, 672 (Iowa 2016) (alterations in original) (internal citations omitted).

## III. Legal Background

"The valuation of property has never been an exact science. . . . Although valuation for tax purposes is necessarily expressed in quantitative terms, the appraisal process has never been and is not now a mathematical exercise." *Id.*

Iowa Code section 441.21(3)(b)(2) (2019) establishes the burden of proof in tax assessment valuation challenges:

> For assessment years beginning on or after January 1, 2018, the burden of proof shall be upon any complainant attacking such valuation as excessive, inadequate, inequitable, or capricious. However, in protest or appeal proceedings when the complainant offers competent evidence that the market value of the property is different than the market value determined by the assessor, the burden of proof thereafter shall be upon the officials or persons seeking to uphold such valuation to be assessed.

Under Iowa law, all taxable property is valued at its "actual value"—i.e. "the fair and reasonable market value." Iowa Code § 441.21(1)(a), (b)(1).

> "Market value" is defined as the fair and reasonable exchange in the year in which the property is listed and valued between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property. Sale prices of the property or comparable property in normal transactions reflecting market value, and the probable availability or unavailability of persons interested in purchasing the property, shall be taken into consideration in arriving at its market value. In arriving at market value, sale prices of property in abnormal transactions not reflecting market value shall not be

taken into account, or shall be adjusted to eliminate the effect of factors which distort market value, including but not limited to sales to immediate family of the seller, foreclosure or other forced sales, contract sales, discounted purchase transactions or purchase of adjoining land or other land to be operated as a unit.

*Id.* § 441.21(1)(b)(1).

Iowa law requires assessors "first seek to use a comparable-sales approach in setting a valuation, and [the] other approaches should only be used when market value cannot be readily determined using the comparable-sales approach." *Nationwide Mut. Ins. Co. v. Polk Cnty. Bd. of Rev.*, 983 N.W.2d 37, 40 (Iowa 2022).

> When valuing real property for tax assessments, the law strives for fairness and uniformity, operating on the notion that similar properties within a given tax classification should be taxed similarly. Because courts reviewing challenges to valuations usually lack technical expertise in appraising commercial real estate, these types of cases often hinge on a factfinder's judgment about conflicting expert witness testimony.

*Id.* at 38.

"Ideally, appraisers would find a recent sale in the same geographic region as their subject property of similar size, age, condition, and current use." *Id.* at 43.[5] Whether properties are sufficiently similar to be considered comparable is "generally left to the sound discretion of the district court." *Wellmark*, 875 N.W.2d at 681. "The mere fact that sales might be considered comparable, however, d[oes] not necessarily mean that valuation based on them [is] credible." *Id.* at 682.

---

[5] Hy-Vee argues the Board's experts conflated "highest and best use" and "present use," and asks that we overrule supreme court case law listing current use as a point of comparison. "We are not at liberty to overturn Iowa Supreme Court precedent." *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990); *see State v. Miller*, 841 N.W.2d 583, 584 n.1 (Iowa 2014) ("Generally, it is the role of the supreme court to decide if case precedent should no longer be followed.").

"When sales of other properties are admitted, the market value of the assessed property must be adjusted to account for differences between the comparable property and the assessed property to the extent any differences would distort the market value of the assessed property in the absence of such adjustments." *Soifer v. Floyd Cnty. Bd. of Rev.*, 759 N.W.2d 775, 783 (Iowa 2009). "If distorting sale factors or the points of difference between the assessed property and the other property are not quantifiable so as to permit the required adjustment, the other property will not be considered comparable." *Id.* While a long-term lease may cloud comparability, "an appraiser may make an adjustment to reflect the effect of the lease on the value of the property." *Walmart, Inc. v. City of Davenport Iowa Bd. of Rev.*, No. 21-1018, 2023 WL 1808504, at *6 (Iowa Ct. App. Feb. 8, 2023) (collecting cases discussing how to address leases in valuation). Similarly, "[v]acant properties can be used as comparable sales if suitable adjustments are made." *Id.* at *5.

**IV. Analysis**

Hy-Vee presented reports and testimony from experts Scaletty and Olson to support its claim the market value of the property was different from the assessed value. The district court found this evidence sufficient to meet Hy-Vee's burden under section 441.21(3)(b)(2), and we agree. The burden of proof then shifted to the Board to uphold the valuation.

"[T]hese types of cases often hinge on a factfinder's judgment about conflicting expert witness testimony." *Nationwide*, 983 N.W.2d at 38. None of the experts relied solely on comparable sales when reaching their "final value" of the property, each including the income approach to some degree in their

reconciliation. Scaletty's report stated he relied significantly on the income approach with the sales approach secondary, but also the sales-comparison approach was weighted 75% and the income approach 25% in his market value analysis.[6] Olson's report indicated he gave the sales-comparison approach secondary weight to the income approach in valuing the property. Cronk gave strong emphasis to sales-comparison and moderate emphasis to the income approach. Manternach's report stated the sales-comparison approach was a credible indicator of value, and the income approach was also given consideration because similar properties "are generally purchased based on their income[-]producing potential."

Despite all appraisers' consideration of multiple approaches in their final opinions, the district court determined "both sides have presented sufficient evidence for the court to consider on the sales approach to market value, . . . and there is no need for the court to address each expert's evaluation under the cost and income approaches." While the experts gave the sales approach varying weights in their analyses, each was able to identify available comparable sales to gauge their approach using this method. The court observed the experts did not agree on what a comparable sale should be and examined the sales considered by each expert.

> Scaletty utilized eight comparable sales in his analysis. While four of the sales involved former grocery stores, none of the properties had the same current use as the property at issue after they were sold. Of the eight, Scaletty only took into account post-sale expenditures on one of the sales (all of the properties were

---

[6] Scaletty testified the language in his report saying the sales approach was weighted secondary to the income approach was not accurate and should not be considered.

vacant at the time they were sold). Two of the properties were former Dahl's[7] grocery stores and both were sold as part of their former owner's bankruptcy; Scaletty made no adjustment in the sales price for these properties, concluding there was no evidence that these transactions constituted distress sales.

Olson utilized six comparable sales in his analysis. Two of the properties involved occupied grocery stores that were purchased for that continued use; of these two, however, one was located in a very small metropolitan area and was considerably smaller than the subject property. While Olson did attempt to make adjustments in the prices for the comparable sales, these were only qualitative in nature (plus, minus or none) and he provided no percentage amount for any adjustments. While such adjustments are allowed as an appropriate appraisal methodology, they have been faulted in at least one other jurisdiction as "not assist[ing] the court in either evaluating an expert's value conclusions or independently finding the Subject's value." He did not make any adjustments for the three former Dahl's stores (the two utilized by Scaletty and a third in Ames that was "essentially a land sale") having been sold as part of an underlying bankruptcy. While he did make some adjustments for post-sale expenditures, he made no adjustment for the subject property having a finished office mezzanine.

Cronk utilized four comparable sales in his analysis. The first two sales represent two sides of the same overall transaction; sale #1 was of a former Nebraska Furniture Mart location and #2 was a former Price Chopper store that became the new location for Nebraska Furniture Mart. In analyzing the second sale, Cronk adjusted the $4 million sale price upwards to the tune of approximately $2.3 million to reflect both additional remodeling expense incurred by the seller (which increased the price) and preexisting water damage as well as the buyer's efforts to sell off a lot on one end (which decreased the price). The last two sales both involved leased fee sales where the property was sold with an outstanding lease back to the seller. Cronk took into account the market rent rates in the affected area in gauging whether the specific lease rates justified any further adjustment; he concluded that the price for sale #3 should be adjusted downward, but that no adjustment was necessary for sale #4 on the basis of the lease price.

Manternach utilized five comparable sales in his analysis. The first sale was a leased fee sale involving a Hy-Vee store in Ankeny; Manternach made a downward adjustment in the price to reflect the superior terms of the lease in relation to market conditions. He also made an upward adjustment for time and changes in the market (the sale took place in 2015 and conditions had improved in

---

[7] In 2015, Dahl's Foods went out of business and liquidated multiple store locations around the Des Moines metro area.

the interim), but also a downward adjustment for superior land to building ratio and the sale location having additional amenities. Manternach's sale #2 was the same transaction as Cronk's sale #2 (the purchase of a former Price Chopper store for use as a Nebraska Furniture Mart location). He made upward adjustments to the sales price for the inferior condition of the property, post-sale expenditures and not having a finished mezzanine. He adjusted downward for the comparable sale having a greater land to building ratio; his overall adjustment was upward to the tune of approximately 29% to $89.63 per square foot. Of the remaining comparables, the third and fifth were significantly adjusted upward overall from their sale prices due to inferior location and condition, as well as not having a finished mezzanine. The fourth comparable sales was a former grocery store in Omaha that was converted to a Hobby Lobby store. Manternach adjusted for post-sale expenditures of $1.5 million to make the conversion. He also made adjustments upward for lower land to building ratio and not having a finished mezzanine.

(Internal citations omitted.)

The district court clearly laid out the principles used to analyze the experts' appraisals. "First, sales comparables that account for the present use of the subject property are preferred over those that do not." "Second, as a corollary to the first point, comparable sales are not necessarily excluded from consideration simply because they involve sale-leasebacks, if appropriate adjustments are made to reflect the value of the fee simple interest of the owner." The court then concluded the Board's experts "provided the more credible and persuasive analysis as to the subject property's actual market value," and "[t]he [Board]'s evidence through its experts, both collectively in terms of properly following the statutory scheme, and most notably through the valuations of Manternach, is sufficient to sustain its burden to uphold th[e] assessment by a preponderance of the evidence."

Hy-Vee contests the district court's evaluations of the experts and their reports. It asserts the court should have rejected the Board's experts' use of

leased-fee sales in their comparable sales and the adjustments the experts made. Instead, Hy-Vee argues Scaletty's and Olson's comparable sales are accurate reflections of market value for the property, particularly the Dahl's Foods location sales discarded by the Board's experts as too old and distressed.

Contrary to Hy-Vee's argument only fee-simple sales should be used as comparable sales, we accept that leased-fee property sales can be considered as long as appropriate adjustments are made.[8]  *See Walmart*, 2023 WL 1808504, at *6.  Cronk explained his adjustments to the leased-fee comparables and the reasoning behind them, but he also testified he gave more weight to his fee simple comparables from the Des Moines market.  Only one of Manternach's comparables was a leased property, and he adjusted the market value downward as appropriate to balance the lease.

Like the district court, we question some of the adjustment decisions by Hy-Vee's experts.  Two sales both Scaletty and Olson relied heavily upon were 2015 sales of former Dahl's Foods grocery stores.  One of the properties was purchased by a convenience store chain to build on and not for use as big box retail, and the other was a foreclosure sale.  *See* Iowa Code § 441.21(1)(b) (defining market value as a sale where neither party is under compulsion to buy or sell, and excluding or adjusting to account for market value distortion factors including foreclosure).  Hy-Vee's experts did not consider these to be distress sales, and neither made adjustments to arrive at a fair market value.  The Board's experts both excluded the sales from their comparables, explaining to the court the sales

---

[8] Ironically, the sale of the property subject of this appeal would be categorically excluded as a comparable sale for valuation under Hy-Vee's theory.

were a little older than they preferred to use and both appraisers considered them to be "distress" sales made because the owning company went bankrupt. The circumstances of the sales were abnormal, and Hy-Vee's experts should have adjusted to correct the market distortion before relying on the sales as sufficiently comparable.

Although no comparable sale was used by all the appraisers in their analyses, one used by Scaletty, Cronk, and Manternach illustrates differing valuation approaches. The appraisers had differing information about the condition of the property at the time of the sale. Scaletty was told it was in good condition with no roof problems and an operational HVAC. Cronk evaluated the sale with an understanding it had roof damage and was in poor condition and therefore included remodeling costs as part of his valuation. Manternach also testified the broker told him the store had been gutted and adjusted accordingly. Their adjusted sale prices per square foot reflected these differing reports of how close to usable the space was: Scaletty's adjusted sale price per square foot was $71.37, Cronk's was $95.25, and Manternach's was $89.63.

On our de novo review, and after examining the appraisals and various comparable sales choices made by the experts, we find no basis to reject the district court's credibility determinations of the expert witnesses. The Board's experts' comparable sales were appropriate, and their adjustments follow Iowa law. We find their appraisals to be persuasive and sufficient to sustain the Board's burden of proof upholding the assessor's valuation. We affirm the decision of the district court.

**AFFIRMED.**