# IN THE SUPREME COURT OF IOWA

No. 14–0093

Filed February 12, 2016

Amended May 6, 2016

**WELLMARK, INC.,**

Appellee,

vs.

**POLK COUNTY BOARD OF REVIEW,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.

County board of review seeks further review of a court of appeals decision affirming the district court's ruling on an appeal from a property tax assessment. **REVERSED.**

John P. Sarcone, County Attorney, and David W. Hibbard and Ralph E. Marasco Jr., Assistant County Attorneys, Des Moines, for appellant.

Deborah M. Tharnish and Christopher E. James of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellee.

**APPEL, Justice.**

In this case, we confront difficult issues related to the proper valuation of a large, well-built, and highly attractive corporate headquarters located in a relatively small metropolitan area for property tax purposes.

This case involves the 2011 assessed valuation of Wellmark, Inc.'s corporate headquarters located in Des Moines (the property). The Polk County Assessor set the valuation at $99 million. Wellmark protested to the Polk County Board of Review (the Board). After a hearing, the Board denied the protest, and Wellmark appealed to the district court. On appeal, the district court entered its findings of fact, conclusions of law, and judgment, finding the valuation of the property for property tax purposes on January 1, 2011, was $78 million.

The Board appealed. Among other things, the Board asserted that the district court improperly relied upon expert testimony based not upon the current use of the building, namely as a headquarters for a single owner-occupant, but as a multitenant office building. We transferred the case to the court of appeals. The court of appeals affirmed the judgment of the district court. We granted the Board's application for further review.

The fundamental issue coursing through this case is whether the Wellmark property should have been valued as if it were a multitenant office building—the most likely use that would result if the property were sold in the limited Des Moines market—or whether the Wellmark property should have been valued according to its current use—a single-tenant headquarters building—even though there was some question whether a buyer for that use could be found in response to a hypothetical "For Sale" sign.

**I. Background Facts and Proceedings.**

**A. The Property.** In March 2010, Wellmark completed construction of its corporate headquarters in downtown Des Moines. The building is comprised of five 599,880-square-foot stories of above-ground office space, and two levels of below-ground parking. An adjoining parking garage and exercise facility are not included in the present appeal.

The record demonstrates that the building is striking and highly attractive. The outside of the building is finished with limestone, sandblasted precast concrete, and glass, with a large U-shaped, recessed, curved glass wall on the southern exposure. The building design allows daylight into all the office workstations.

The first floor contains a lobby, several entrances, a convenience store, an art gallery, a full-service restaurant, and a conference center. The second floor contains an auditorium and facilities to support that room, with approximately 90,000 square feet unfinished and unoccupied. The third and fourth floors contain open office space. The third- and fourth-floor space is filled primarily with cubicles with some private offices. The fifth floor is designed the same as the third and fourth floors with an executive office area at the southwest corner.

Additionally, the property was designed to be energy efficient and environmentally friendly. The property has achieved LEED (Leadership in Energy and Environmental Design) platinum certification.[1] LEED is a green building certification program devised by the United States Green Building Council. There is no dispute that the structure provides class-A

---

[1]*See* U.S. Green Bldg. Council, *LEED Overview* (2016), http://www.usgbc.org/leed. Platinum certification is the highest level of LEED certification. *See id.*

office space with first-class amenities. It was also undisputed that the cost to construct the building exceeded $150,000,000.

The property could fit comfortably into the surroundings of the suburbs of Chicago, an expanding Sunbelt city, or an East Coast office park. It is located, however, in the commercial real estate district known as the central business district (CBD) in downtown Des Moines. The Des Moines metropolitan statistical area (MSA) is characterized as a "third-tier" MSA with an area population of approximately 490,000.

**B. Assessment/Protest.** Although staff at the Polk County Assessor's office originally believed the property should be valued in excess of $100,000,000 for property tax purposes as of January 1, 2011, the assessment eventually embraced by Polk County after a series of meetings and consultations with senior local tax officials was $99 million. In May 2011, Wellmark timely filed a protest of the valuation with the Board, asserting the taxing authorities assessed the property for more than the value authorized by law. *See* Iowa Code § 441.37(1)(*b*) (2011). In contrast to the assessor's value of $99 million, Wellmark asserted that the actual value of the property was $72 million. In June, the Board denied the protest, noting "[t]he assessed value of [the] property was not changed because market data indicate[d] that the property is assessed at its fair market value." Wellmark appealed to the district court.

A bench trial commenced in July 2013. At the beginning of trial, Wellmark stated without objection that the parties had agreed to a stipulation, noting among other things that "the only grounds that [the

parties were] proceeding on today [would be] that the property [was] assessed for more than the value authorized by law."[2]

Four well-qualified appraisers testified regarding the value of the property: Chris Jenkins and Ted Frandson for Wellmark, and Peter Korpacz and Bernie Shaner for the Board. The appraisers looked to three traditional approaches to find the property's value: cost, comparable sales, and income. After arriving at a value based on each of these three traditional approaches, the appraisers reconciled the three approaches to reach their final conclusion regarding value. The table below sets forth the valuations of each appraiser under each method of valuation and their reconciliations of the different approaches:

|  | Jenkins | Frandson | Korpacz | Shaner |
|---|---|---|---|---|
| Comparable-Sales Approach | $65,100,000 | $65,987,000 | $143,800,017 | $83,980,000 |
| Income Approach | $68,480,581 | $75,209,978 | $149,798,817 | $87,450,000 |
| Cost Approach | $71,100,000 | $73,123,000 | $149,798,812 | $122,970,000 |
| Reconciliation | $68,000,000 | $70,000,000 | $145,000,000 | $120,000,000 |

The Polk County Assessor valued the property at $99 million using the cost approach. The record does not contain calculations supporting this figure, but it appears to have been a result of a series of internal meetings in the assessor's office.

The parties' experts differed on many points and adjustments in their analyses. A key issue was one of methodology. The Board's experts, Korpacz and Shaner, emphasized the current use of the Wellmark building as a single-occupant corporate headquarters. This

---

[2]Wellmark filed a motion to strike contending that the Board, in its reply brief, argued that the district court impermissibly relied on a statutory ground not relied upon by Wellmark—namely, that the assessment was not equitable. The court of appeals denied the motion. We agree with the court of appeals and do not give this issue any further consideration.

use was the linchpin of their evaluation. They asserted that the proper way to value the business was in a hypothetical transaction in which the buyer would continue the current use. Recognizing there were no Des Moines area transactions in which a large office building was purchased by an owner-occupant for sole use as a corporate headquarters, Korpacz considered corporate headquarters transactions identified from a national database in a wide variety of national locations. While Shaner relied on local multitenant office structures in his comparable-sales and income analyses as the best available comparisons in the local area, he ultimately emphasized his relatively high-cost valuation as the most accurate reflection of the value of the property when used as a corporate headquarters by a single occupant. By emphasizing national sales and by valuating the building at relatively close to actual cost, the Board's experts asserted they had provided the best way to value the building according to its current use, justifying a valuation well in excess of the $99 million assessment imposed by the Board.

The experts for Wellmark disagreed. They believed it very unlikely that the Wellmark building could be sold on the open market to a single corporate entity for use as a corporate headquarters. Their position was based primarily on the realities in the local Des Moines market. Wellmark's experts pointed out they were unaware of any occasion in the Des Moines market when an existing building was purchased by a third-party corporation for use as a single-tenant headquarters. Instead, Wellmark's experts noted that corporations seeking new locations for corporate headquarters have generally chosen to construct new built-to-suit signature structures in the Des Moines area. To the extent corporations have acquired local buildings for headquarters use, they

have only partially occupied the premises and rented out the balance to other tenants. Additionally, Wellmark's experts noted the very large size of the Wellmark structure further supported the view that even in the event a corporation was interested in purchasing the building for headquarters use, it is very likely that a substantial balance of the property would be rented out to third-party tenants.

Thus, the Wellmark experts viewed the possibility of a corporation buying the building for use as a single-occupancy corporate headquarters very unlikely. Given the realities of the local marketplace, the experts for Wellmark determined the value of the building by using analysis of multitenant office buildings in the Des Moines market or similar geographic areas.

**C. District Court Order.** For the most part, the district court agreed with Wellmark. The district court found that Wellmark had produced two disinterested witnesses that indicated the market value of the property was less than the market value determined by the assessor and therefore the burden shifted to the Board to uphold the assessment value. *See id.* § 441.21(3).

The district court considered the valuations arrived at by the experts using the comparable-sales approach. The district court noted it gave more weight to Wellmark's experts because they each examined properties located in Polk County and other municipalities, which was "essential here in light of each appraiser's comment that there were relatively few sales of buildings as corporate headquarters which is the present use of the Property." Yet, the district court further noted that the evaluations of Wellmark's experts did not involve sales of corporate headquarters to single occupants, which also represented the present use of the building.

Korpacz did identify sales of corporate headquarters buildings by single occupants, but none were local. The district court noted Korpacz's conclusions were diminished by the facts that he did not examine any transaction in Iowa or Polk County and that he used properties from larger metropolitan markets where there would be more potential buyers. These sales, the district court found, did not constitute comparable sales because they did not take into account the availability or unavailability of a willing buyer in the local marketplace.

The district court did not feel comfortable relying solely on the comparable-sales approach. It concluded that the market value of the property was not "readily established" by the comparable-sales approach and therefore considered evidence presented involving "other factors." *See id.* § 441.21(2).

Before making its conclusion as to value, the district court noted it found it "very difficult to reconcile any of the approaches utilized by the appraisers in this case" because "each one utilized different properties" and "made different assumptions with those assumptions being made in favor of the party that retained them." Additionally, the district court noted, "In some instances there appeared to be different mathematical methods used to reach [the appraisers'] conclusions . . . ."

In the end, upon de novo review, the district court found the value of the property on January 1, 2011, was $78 million. This valuation was consistent with an approximate cost of $136 per square foot under the comparable-sales approach, a nine percent capitalization rate under the income approach assuming the multitenant use of the property, and a fifty-two percent total obsolescence and depreciation rate under the cost approach. Additionally, the district court found the valuation resulted in a tax of $130 per square foot, which appeared to be fair and equitable

when compared to other similar corporate headquarters in downtown Des Moines that were built in the past decade.

The Board appealed, contending Wellmark's appraisers failed to consider the current use of the subject property—a single-tenant, owner-occupied building—when setting the assessed value. On the other hand, the Board's experts, and specifically Korpacz, looked to owner-occupied properties using each appraisal approach. Therefore, the Board argued, the district court erred in not relying on the Korpacz valuation. Additionally, the Board argued that reliance on the income approaches of Jenkins, Frandson, or Shaner improperly exempted from assessment and taxation a substantial amount of market value. We transferred the case to the court of appeals, which affirmed the district court's judgment. The Board filed an application for further review, making two contentions. First, that the court of appeals erred in determining that the market value of the property could not be readily established using the comparable-sales approach. Additionally, the Board reprised its first argument on appeal, contending the court of appeals and the district court erred by allowing the property to be valued as though it were hypothetically used as a multitenant, investor-owned building rather than valuing it based upon its present use as a single-owner-occupied home office. We granted further review. For the reasons expressed below, we reverse the decision of the district court.

## II. Standard of Review.

Our review of a tax protest is de novo. *Boekeloo v. Bd. of Review*, 529 N.W.2d 275, 276 (Iowa 1995); *see also Dolphin Residential Coop., Inc. v. Iowa City Bd. of Review,* 863 N.W.2d 644, 647 (Iowa 2015) ("[A]ppeals from decisions of the local board of review are triable in equity . . . , and our review is de novo . . . ."). "[W]e give weight to the [district] court's

findings of fact, [but] we are not bound by them." Iowa R. App. P. 6.904(3)(*g*); *Boekeloo,* 529 N.W.2d at 276. We are especially deferential to the court's assessment of the credibility of witnesses. *Boekeloo,* 529 N.W.2d at 276.

### III. Introduction to Valuation Issues Related to Distinctive Properties.

**A. Overview.** The valuation of property has never been an exact science. In colonial times valuing property was known as the "rule of common estimation." *See Joint Highway Dist. No. 9 v. Ocean Shore R.R.,* 18 P.2d 413, 417 (Cal. Ct. App. 1933). Although valuation for tax purposes is necessarily expressed in quantitative terms, the appraisal process has never been and is not now a mathematical exercise.

Aside from the difficulty of quantitative line-drawing, there are important conceptual problems that complicate our consideration of this appeal. A threshold conceptual issue lurking in this case relates to the proper methodology to be employed for tax purposes when a building has substantial, even dramatic, features and improvements that the owner beneficially uses but the value of which might not be objectively demonstrable through past marketplace transactions. The classic example is the New York Stock Exchange building, which was very costly to build but which the owners claimed could not be sold on the open market because its unique features were of no value to anyone else. Does such an expensive property, for property tax purposes, have zero value because there are no willing buyers? *See People ex rel. N.Y. Stock Exch. Bldg. Co. v. Cantor,* 223 N.Y.S. 64, 68–69 (App. Div. 1927) (rejecting zero value claim), *aff'd mem.,* 162 N.E. 514 (N.Y. 1928). In this case, the question is whether, for property tax purposes, the value of a building with all its fine amenities should be based upon the taxpayer's current

use as an owner-occupied headquarters building, even though there may not be a local market for such a property. The issue is sometimes framed as whether the proper approach to valuation is one based on "value in use" versus a market-based "value in exchange." *See Daly City v. Smith,* 243 P.2d 46, 51 (Cal. Dist. Ct. App. 1952) ("[I]t is not value in use, either actual or prospective, to the owner that is involved, but value in exchange . . . that is the test.").

But the question is not entirely binary. If a property exhibits features that provide unique value to the owner but literally to no one else, that is one thing. But what if the current use of the property is not only of benefit to the current owner but also has at least some impact on the market value of the property? A property currently hosting a very successful business might draw more in the marketplace than an identical property with a struggling business. Is there a distinction between value-in-use to the owner, fulfilling solely the whim and fancy of the owner, and value-in-use that impacts what a willing buyer would pay for the property in the open market? Further, what if the property has features that are not truly unique but are nonetheless sufficiently specialized to give rise to only a limited market of purchasers?

And there is more. What happens when we try to value a distinctive but not unique property that has a limited market but there are no reliable comparable sales upon which to base a market value? If, for example, a corporate headquarters building with a single occupant cannot be sold in the local market to another single-occupant corporation, do we move down market and determine what the property would fetch if converted into a general office building, for which the local market is fairly robust? Or do we use appraisal techniques other than comparable sales—such as income capitalization or reproduction costs—

to arrive at the value that would be obtained in a hypothetical sale to a party that would benefit from current use?

We next explore these issues as they are discussed in the caselaw. Because any tax question must be evaluated in the context of the specific statutory framework in each jurisdiction, the cases cited below are not intended to present binding authority or even persuasive authority. They are instead designed to illustrate some of the principles and challenges facing the court in this Iowa case and to contextualize the implications of our resolution of the issues presented.

**B. Value in Use Versus Value in Exchange.**

1. *General principle.* The Board asserts that Wellmark's experts erroneously relied upon calculations of value for the property that assumed that the space would not be utilized as a single-occupant corporate headquarters but as a multitenant office building if the property were for sale. The legal question underlying this issue is the proper methodology that an assessor should apply in determining the actual value for purposes of taxation of a large, high-quality, state-of-the-art, LEED-certified, and even beautiful office building constructed and occupied by a single tenant as a headquarters in a tertiary market where there are no comparable sales to support valuation of the property.

The question at least implicates the difference between what is referred to in the cases and tax literature as "value in use" and "value in exchange." *See* Jerrold F. Janata, *Courts Weigh In on "Highest and Best Use" and Other Valuation Issues*, J. Multistate Tax'n & Incentives, January 2001, at *1, 2001 WL 43749 [hereinafter Janata]; Nancy S. Rendleman, Charles B. Neely, Jr., & W. Christopher Matton, *Toward a Better Understanding of Value-In-Use in Property Tax Appraisals*, J. Prop. Tax Mgmt., Winter 1997, at 1, 5–10. "Value in exchange" refers to the

value to persons generally and focuses on market value based upon a willing buyer and willing seller. Janata, 2001 WL 43749, at *2. "Value in use" refers to the value a specific property has for a specific use. *Id.* Value in use is based upon the value of the property as it is currently used, not on its market value considering alternative uses. *Id.* If a value-in-use approach is applied, the fact that an overbuilt property has substantial value to the current user impacts valuation for purposes of taxation.

One of the frequently cited cases seemingly applying a value-in-use approach is *Joseph E. Seagram & Sons, Inc. v. Tax Commission*, 200 N.E.2d 447 (N.Y. 1964). Seagram constructed a "monumental and magnificent" structure for $36,000,000 but urged that under an income approach to value, the building was worth only $17,000,000. *Id.* at 448. Although the opinion is cryptic, the majority noted that Seagram did not build the structure for commercial rental income and that the income capitalization approach produced a "false result." *Id.* Therefore, the cost to construct the building was a factor to consider in valuation, at least in the years soon after construction. *Id.* Further, "the hypothetical rental for owner-occupied space need not be fixed at the same rate as paid by tenants." *Id.* The dissent, in contrast, indicated that if the tenants of the building were willing to pay more for space in the Seagram Building than for similar space elsewhere, that would be fully reflected in the capitalization of earnings. *Id.* at 450 (Burke, J., dissenting).

2. *Strict value in exchange requiring actual comparable sales.* In contrast to *Seagram,* other courts have hewed more closely to the value in exchange or market approaches to value for purposes of taxation. Some have strongly emphasized the role of actual comparable market transactions in arriving at valuation for tax purposes.

A leading case is *Wisconsin ex rel. Northwestern Mutual Life Insurance Co. v. Weiher,* 188 N.W. 598 (Wis. 1922). In *Weiher,* the court was confronted with determining the proper valuation for property tax purposes of "a fine substantial, artistic building gracing half a block in the city of Milwaukee built to meet the peculiar needs of its owner, and not well adapted for other uses." *Id.* at 599. The *Weiher* court held that Wisconsin law "requires that property shall be assessed with reference to purposes for which it may be sold rather than the purposes to which it presently may be devoted." *Id.* (*quoting Wis. ex rel. Oshkosh Country Club v. Petrick,* 178 N.W. 251, 252 (Wis. 1920)).

A similar approach was taken in *F & M Schaeffer Brewing Co. v. Lehigh County Board of Appeals,* 610 A.2d 1 (Pa. 1992). In *F & M Schaeffer,* the court considered the value of a 791,000-square-foot brewery. *Id.* at 2. The taxpayer valued the property using the comparable-sales approach at $9.5 million. *Id.* at 3. The assessor, however, determined value by analyzing the annual brewing capacity of the plant and achieved a value of $34 million. *Id.*

The Pennsylvania Supreme Court rejected the assessor's approach. *Id.* at 7. The Pennsylvania court emphasized that the statute required the court to determine "actual value" of property; that the legislature mandated the use of comparable sales, income, and cost approaches to making that determination; and that "a property's use and its resulting value-in-use cannot be considered in assessing fair market value" of the property. *Id.* at 4.

A more recent illustration of relatively strict insistence on value in exchange as reflected in actual market transactions is *Pacific Mutual Life Insurance Co. v. County of Orange*, 232 Cal. Rptr. 233 (Ct. App. 1985). As in this case, the property being appraised was a five-story building

used as a corporate headquarters by an insurance company. *Id.* at 234. The property had distinctive qualities, including an architectural style of an inverted pyramid and a large central atrium. *Id.* The taxpayer argued that the property, if sold in the local market, would likely be utilized as a general office building. *Id.* at 237. The court in *Pacific Mutual* agreed with the taxpayer, indicating that the use of the property as an office building was the most likely market result. *Id.* The implication of *Pacific Mutual* is that the highest and best use of property for purpose of valuation ordinarily can be no higher than that for which there are comparable sales in the marketplace.

Even in a jurisdiction that embraces a strict value-in-exchange theory, the use of a property still may be germane to value under the theory that the current use of the property would impact what a willing buyer would pay for the property in the marketplace. For example, property may have more market value when used for a reservoir than when it is open grassland. *Joint Highway*, 18 P.2d at 417. The potential use, however, may influence how the market values the property. *See City of Stockton v. Ellingwood*, 275 P. 228, 231 (Cal. Dist. Ct. App. 1929) (a use of property may make it more valuable to purchasers generally).

The strength of the actual value-in-exchange approach is its emphasis on objective marketplace transactions that tend to cabin the subjectivity in the valuation process. The obvious problem, however, is that extremely valuable and costly properties for which there are no current buyers or sellers may largely escape taxation.

3. *Use of hypothetical transaction to value property where current use has limited or no relevant comparable sales.* There is another approach in the caselaw, however, to the problem of limited or no comparable sales for property with specialized uses. A court could

decide not to look for comparable sales of a different or broader use in evaluating the property but instead simply assume for valuation purposes that there is a hypothetical buyer who would purchase the property and continue the current use. *See* James C. Bonbright, 1 The Valuation of Property 59 (1937).

The concept of a hypothetical buyer can be particularly important in cases involving large but specialized industrial properties that are not generally bought and sold in the marketplace but also have been employed in the context of a sale of corporate headquarters. The obvious impact of utilizing a hypothetical buyer theory is to shift the focus away from comparable sales and focus on other theories of valuation, usually replacement cost.

The notion of a hypothetical buyer even when there was no active market for property at its present use was applied in *CPC International Inc. v. Borough of Englewood Cliffs*, 473 A.2d 548 (N.J. Super. Ct. App. Div. 1984). The court considered the value of a complex of buildings comprising the international headquarters of CPC International. *Id.* at 550. The court described the buildings as "an artful blend of function and aesthetics." *Id.* at 551. Although the gross area within the buildings was 251,000 square feet, only 160,500 were available for use as office space. *Id.* at 550. The structure had 34,000 square feet of terraces, interconnecting bridges, escalators that occupied five or six times the space of elevators, and a "Cadillac" climate control system. *Id.* at 551. The taxpayer in *CPC* asserted that the likelihood of finding a buyer with comparable requirements was so remote that the downward adjustment in valuation was required. *Id.* at 552. The tax court agreed, reducing the assessment of the building for functional obsolescence because "[t]he

building layout and expensive heating system all represent excessive costs which are not fully returnable in the market." *Id.* at 551.

The court in *CPC* disagreed. *Id.* at 551–52. Citing New Jersey caselaw, the court held that no reduction from taxable value would be allowed for special-purpose characteristics because those characteristics were built into the structure by the taxpayer without regard to the recoverability of their costs and there was no realistic suggestion that the property was for sale. *Id.* at 552. While recognizing that the overbuilt characteristics might not be recognized in the income or selling price of the building, the *CPC* court noted that the improvements were installed not to produce income or increase selling price but for the owner's own use. *Id.* at 553. As a result, the court held that there should be no reduction in valuation for the overbuilt character of the property. *Id.* As noted by a later Connecticut court, under *CPC*, there is no requirement of "an actual likely purchaser in the marketplace." *Gen. Motors Corp. v. Linden City*, 22 N.J. Tax 95, 124 (2005). Instead, a court will "presume that a hypothetical buyer exists 'whose requirements are reasonably accommodated by the property in question.' " *Id.* (quoting *CPC Int'l*, 473 A.2d at 552).

A similar approach was taken by a court in Connecticut. In *Aetna Life Insurance Co. v. City of Middletown*, the court considered the value of the corporate headquarters of a large insurance company. No. CV960078839S, 2002 WL 377147, at *1 (Conn. Super. Ct. Feb. 14, 2002). Like here, the property was distinctive. It had many amenities, a fitness center, lecture hall, conference rooms, convenience store, hair salon, cafeteria, and a well-lit central court with a large granite water fountain. *Id.* at *2. Because the headquarters was an extremely large building (nearly 1.5 million square feet), which was not common in the

real estate market, the court found no comparable sales. *Id.* at *7. Rather than value the building based on other usages that would have been reflected in comparable local sales, the court engaged in a reproduction-cost analysis. *Id.* at *9; *see also Gen. Elec. Co. v. Fairfield*, No. CV020392891S, 2005 WL 2081269, at *5 (Conn. Super. Ct. July 22, 2005) (declining to value national headquarters of General Electric based on multitenant market value, but instead concluding that the cost approach was the most reliable method of determining market value); *Beneficial Facilities Corp. v. Peapack & Gladstone Borough*, 11 N.J. Tax 359, 363, 376 (1990) (evaluating a corporate headquarters with Italian Palladian style architecture, extensive use of bricks, arched windows, false chimneys, light wells for underground corridors, archways, patios, fountains, and copper roofs under cost approach), *aff'd per curiam*, 13 N.J. Tax 112 (N.J. Super. Ct. App. Div. 1992).

An Oregon court took a similar approach in *Freedom Federal Savings & Loan Association v. Department of Revenue*, 801 P.2d 809 (Or. 1990) (en banc). In that case, the Oregon court considered the value of the headquarters building of a savings and loan association. *Id.* at 811. The taxpayer argued that there was no immediate market for the building as a corporate headquarters and that it should be valued as a multitenant office building. *Id.* at 812. The court rejected the theory although there were no comparable sales available to assist in the valuation of the structure and financial institutions do not usually buy their headquarters buildings but instead build them to their own specifications. *Id.* at 813. Nonetheless, the Oregon court determined that the cost approach was the best method to evaluate the structure. *Id.* In applying the cost approach, the court also declined to reduce the value for "inutility" because the property was overbuilt for a multitenant

office building, noting that there was no overbuilding while the property was used as a corporate headquarters. *Id.*

The notion of hypothetical market transactions where there are no comparable sales of specialized property is particularly important in the context of large industrial properties. A leading case is *Ford Motor Co. v. Edison Township*, 10 N.J. Tax 153 (1988), *aff'd,* 604 A.2d 580 (N.J. 1992). In that case, the court considered the value of an automobile assembly, manufacturing, warehouse, and office complex. *Id.* at 158. The taxpayer asserted that there was no demand for an automobile plant and that the property should not be evaluated based on current use but instead as a general manufacturing facility. *Id.* at 161. The court emphasized that property should generally be evaluated by "the actual condition in which the owner holds it." *Id.* at 165. The *Ford Motor* court made an analogy to the law of eminent domain, noting that in this field,

> it has long been accepted . . . that if the property were being employed, at the time of the taking, in the use which is asserted to be the highest and best, that proof of actual use satisfies the requirement of showing the existence of a demand for that use.

*Id.*

The court emphasized that there was nothing in the record to suggest that the facility was unmarketable for its current use. *Id.* at 166. It further noted that the taxpayer's approach "would permit valuable features presently being used to entirely escape their just share of the burden of taxation." *Id.*

A similar case is *Nestle USA, Inc. v. Wisconsin Department of Revenue*, 795 N.W.2d 46 (Wis. 2011). In that case, the Wisconsin Supreme Court considered the value of a plant used to manufacture infant formula. *Id.* at 48. Nestle argued that there were no sales of

comparable manufacturing facilities and that as a result, the property should be valued as a general food processing plant. *Id.* at 51. The Wisconsin court rejected the taxpayer's suggestion, noting that the fact that there were no comparable sales did not demonstrate that there was no market for the plant as an infant formula manufacturer. *Id.* at 57. The court emphasized that the taxpayer failed to offer evidence that no market existed for an infant formula manufacturing plant. *Id.* The evidence did not establish that there was no market for an infant formula manufacturing plant, only that there were no comparable sales to assist in the evaluation of the property. *Id.*

Another case involving these principles is *STC Submarine, Inc. v. Department of Revenue*, 890 P.2d 1370 (Or. 1995) (en banc). In that case, the property was used for a manufacturing facility for marine fiber optic cable. *Id.* at 1370. STC's three existing competitors already owned their own plants. *Id.* at 1371. As a result, STC argued that the property should be valued as general-purpose industrial property and not as a manufacturing facility for marine fiber optic cable. *Id.*

The Oregon court rejected the taxpayer's argument. *Id.* at 1372–73. The court reasoned that there was a possibility that existing competitors or new entrants to the market would purchase the property. *Id.* at 1372. According to the court, "[t]he building's special features, designed to accommodate [its current] use, are part of the property's value-in-exchange, because they increase the amount at which the property would change hands in the marketplace." *Id.* at 1374.

A third possible approach is to consider all proffered theories of valuation in arriving at a proper assessment and simply to make a judgment call of market value. A representative case is *Supervisor of Assessments v. U.S. Fidelity & Guaranty Co.,* No. 1263, 1978 WL 1493

(Md. Tax Feb. 1, 1978). In that case, the trial court was to determine the value of the headquarters of United States Fidelity and Growth Company, a large insurance company. *Id.* at *1. The building itself was unusual, attractive, and of superior quality. *Id.* The taxpayer recognized that the property cost $56,000,000 to build but asserted that its market value was $26,000,000. *Id.* at *3. The Maryland trial court raised the question of whether the building should be valued as a prestigious home office building of a major insurance company or as a commercial office building available for rental with an anticipated profitable net income. *Id.* at *4–5. In that case, the court seems to have given some credence to the testimony of all experts in arriving at a middling value of $36,000,000. *Id.* at *5. The approach of the Maryland trial court seems somewhat undisciplined, but perhaps its candor should be applauded for avoiding exaggerated claims of certainty and recognizing that valuation is, at best, an educated guess. *Cf. Joint Highway,* 18 P.2d at 419 (noting that an expert opinion that failed to recognize potential but not active demand for property should be "weighed accordingly").

### IV. Relevant Iowa Statutes and Caselaw.

**A. Iowa Statutes Related to Valuation**. With the above discussion providing context, we now turn our focus specifically to Iowa tax statutes. Traditionally, Iowa statutory law provided that property be taxed at "actual value." "Actual value" was defined statutorily to mean "value in the market in the ordinary course of trade." Iowa Code § 1305 (1897). "Value in the market," however, was not further defined in the statute.

In 1959, the legislature replaced the "value-in-the-market" approach for a broader "actual-value" framework for property tax purposes. The 1959 legislation provided,

> In arriving at said actual value the assessor shall take into consideration its productive and earning capacity, if any, past, present, and prospective, its market value, if any, and all other matters that affect the actual value of the property . . . .

1959 Iowa Acts ch. 291, § 21 (codified at Iowa Code § 441.21 (1962)).

The 1959 statutory provision embraced an open-ended, totality-of-circumstances approach to valuation. In considering "actual value," the assessor was required to take into account productive and earning capacity, market value, and "all other matters" that affected "actual value." The meaning of "actual value" was not further defined. The lack of legislative direction in the new statute gave assessors broad discretion in determining the methodology to use in determining actual value.

The legislature again revised the provisions related to the meaning of actual value in 1967 which remains part of our present Code today. *See* Iowa Code § 441.21(1) (2015). This time, the legislature provided a comparatively detailed framework for assessors in determining the actual value of property. The 1967 legislation provided,

> The actual value of all property subject to assessment and taxation shall be the fair and reasonable *market value* of such property. "*Market value*" is defined as the fair and reasonable exchange in the year in which the property is listed and valued between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property. Sale prices of the property or comparable property in normal transactions reflecting market value, and the probable availability or unavailability of persons interested in purchasing the property, shall be taken into consideration in arriving at its *market value.*

1967 Iowa Acts ch. 354, § 1 (emphasis added) (codified at Iowa Code § 441.21(1) (1971)).

As is apparent, the 1967 legislation restored the emphasis of prior law on "market value." The legislature recognized, however, that there

could be some circumstances where the market value of taxable property could not be readily established. Thus, the legislature enacted an alternate approach to establishing actual value. Specifically, the legislature provided,

> In the event market value of the property being assessed cannot be readily established in the foregoing manner, then the assessor may consider its productive and earning capacity if any, industrial conditions, its cost, physical and functional depreciation and obsolescence and replacement cost, and all other factors which would assist in determining the fair and reasonable market value of the property but the actual value shall not be determined by use of only one such factor.

*Id.*

Under the 1967 legislation, then, market analysis is the preferred method of determining actual value. If market analysis can provide a reliable estimation of value, the process is at an end. "Other factors" may be considered *if, and only if*, market value cannot be readily established through the preferred market analysis. Once that threshold has been crossed, the assessor may consider a broad range of factors, but cannot rely solely on one such factor in determining "the fair and reasonable market value" of the property, or "actual value."

Although the 1967 legislature in its alternative approach to actual value incorporated the other-factors approach generally embraced in the prior statute, the legislature imposed limits on it. Specifically, the legislature declared that the following shall not be taken into consideration: "special value . . . of the property to its present owner, and the good will or value of a business which uses the property as distinguished from the value of the property as property." *Id.*

As with all tax statutes, this provision must be read carefully. The legislature did not prohibit consideration of all special value or all good

will or value of the business in valuing property. Instead, the legislature prohibited only use of special value "to its present owner" and good will or value of a business "distinguished from the value of the property as property." *Id.* Thus, where the special value is not limited "to its present owner," or where good will or the value of a business which uses the property impacted the value of the "property as property," the prohibitions do not apply.

**B. Iowa Caselaw Addressing Valuation Issues.**

1. *Caselaw prior to 1967.* An illustrative case involving the law prior to 1967 is *Bankers Life Co. v. Zirbel,* 239 Iowa 275, 31 N.W.2d 368 (1948). In *Bankers Life,* we considered the valuation for property tax purposes of the Bankers Life Building in Des Moines. *Id.* at 276, 31 N.W.2d at 369. The Bankers Life property was considered the ultimate in beauty and utility of design, featuring a gymnasium, an auditorium, extra elevators, a pneumatic tube system, panel heating, auxiliary lighting, and an unusual-capacity air conditioning system. *Id.* at 277–78, 285, 31 N.W.2d at 369–70, 374.

The taxpayer claimed that valuation should be based on market value. *Id.* at 280, 31 N.W.2d at 371. However, we noted that the statute (at the time) was a multifactored statute in which actual value was not necessarily the same as market value. *Id.* We noted that our state was different from that in the Wisconsin case of *Weiher,* where the statute simply declared that property should be valued at "full value which could ordinarily be obtained therefor at private sale." *Bankers Life,* 239 Iowa at 283, 31 N.W.2d at 372 (quoting *Weiher,* 188 N.W. at 598). Based on a totality-of-factors approach, we concluded that we were not prepared to say that the valuation of the building with a twenty-four percent discount from actual cost was insufficient. *Id.* at 286, 31 N.W.2d at 374.

2. *Cases interpreting special value or use under the current statute.* After the 1967 legislation, of course, the framework for considering valuation for property tax purposes was altered. An important case under the new statute was *Maytag Co. v. Partridge*, 210 N.W.2d 584 (Iowa 1973). There, we were called upon to consider the proper valuation of the Maytag manufacturing facility in Newton. *Id.* at 586. With respect to Plant No. 2, the parties did not discover any comparable sales. *Id.* Therefore, valuation was based necessarily not on comparable sales but on the other-factors statutory test. *Id.* at 596.

One of the important questions in *Maytag* was how the equipment on the premises, which was considered part of the real estate for tax purposes, should be valued. *Id.* at 586. One possibility was the value of the equipment if sold on the used equipment market. *Id.* at 588. On the other hand, the equipment arguably had more value than the sum of its parts. *Id.* at 589. Maytag had a complete line of machinery in place and functioning as an integral part of a profitable manufacturing establishment. *Id.* We concluded that when an assessor considers the use being made of property with a complete line of equipment as part of a profitable enterprise, the assessor is merely following the rule that he must consider conditions as they are in the valuation process. *Id.* at 590. By so valuing the property, the assessor was not violating the statutory provision prohibiting considering special value or use because the equipment was not "of peculiar value to the owner." *Id.* at 591. The equipment in place would have value to other competent home appliance manufacturers that might acquire the property and operate the plant. *Id.* We contrasted the use of *Maytag* equipment, which gave value to the property, with "features and fancies" of personal delight to the owner that added no value to the property for others. *Id.*

After *Maytag,* we again turned to the question of valuation of a prestigious office building in *Equitable Life Insurance Co. v. Board of Review*, 281 N.W.2d 821 (Iowa 1979). In that case, we considered the value of the Equitable Life Insurance headquarters in downtown Des Moines. *Id.* at 823. The taxpayer suggested that "no other insurance company would want to occupy a building so closely identified with Equitable" and therefore the Board improperly considered the building's current use in its evaluation. *Id.* at 824–25. While we noted that the argument was contrary to Equitable's experts, who valued the premises based on similar use, we held that whether the prior use of the building by Equitable as a signature corporate headquarters would scare off potential buyers was a question of fact to be determined by the fact finder. *Id.* at 825.

We considered other issues surrounding an office building in *Ruan Center Corp. v. Board of Review*, 297 N.W.2d 538 (Iowa 1980). One of the issues in that case was whether improvements made by tenants should be considered in determining the value of the building. *Id.* at 541. The improvements included such common things as new carpet and paneling but also included more unusual improvements such as a bank vault and an area for computers installed by Wellmark's predecessor, Blue Cross. *Id.* at 541–42. While we recognized that the tenant improvements might not have value to every possible tenant, they were nonetheless not unique to a specific property owner and thus were not within the scope of the statutory prohibition of consideration of special value or use. *Id.* at 542.

We contemplated whether it was improper to consider intangibles in valuing property in *Merle Hay Mall v. City of Des Moines*, 564 N.W.2d 419 (Iowa 1997). In that case, the taxpayer challenged sales prices

considered in the valuation process for including intangibles such as name recognition, the assembled work force, and the ability to attract anchor stores. *Id.* at 423–24. We held that unless prohibited under Iowa Code section 441.21(1) (1993), intangibles may be considered in valuing the real estate with which they are associated. *Id.* at 424.

Finally, we revisited the question of whether valuation of property at its current use improperly included intangibles in *Soifer v. Floyd County Board of Review*, 759 N.W.2d 775 (Iowa 2009). In *Soifer*, we emphasized that we had adopted "a narrow interpretation" of special use or value that cannot be considered in valuating real property for tax purposes. *Id.* at 786 n.6. We emphasized that in order for intangibles to be excluded, they must have value to the owner that simply would not be enjoyed by another party. *Id.* at 787. The fact that a valuable going concern is located on the property and tends to increase the value of the property does not mean that intangibles have been impermissibly considered in the valuation process. *Id.* at 788.

3. *Caselaw involving comparable property.* We have had a number of cases dealing with what might be considered comparable sales under the preferred-market test in the Iowa statutory regime. We have generally held that comparable sales are not strictly limited to a specific geographic area. For instance, in *Bartlett & Co. Grain v. Board of Review*, we held that in a highly competitive industry, sales of terminal elevator properties in the geographic area that includes the Midwest were sufficiently similar to amount to comparable sales. 253 N.W.2d 86, 90 (Iowa 1977). We have similarly held that assessors cannot artificially limit searches for comparable sales to the city in which the property is located, declare there are no comparable sales, and then seek to employ an other-factors analysis in determining value. *Compiano v. Bd. of*

*Review*, 771 N.W.2d 392, 396 (Iowa 2009); *Carlon Co. v. Bd. of Review*, 572 N.W.2d 146, 149–50 (Iowa 1997).

We have also held that comparable sales do not need to be identical, but only similar to the subject property. The key case on this issue is *Soifer*, 759 N.W.2d at 775. In *Soifer*, we considered the value of property in Charles City where a McDonald's franchise was located. *Id.* at 778. We noted that comparable properties did not need to be identical, but only similar. *Id.* at 783. Factors to be considered include size, use, location, and character. *Id.* We declared that whether properties were sufficiently similar to be comparable was generally left to the sound discretion of the district court. *Id.* Specifically, we found that although sales of franchise properties might be the most similar based upon current use of the property, that did not mean that sales involving non-franchise restaurants were not similar. *Id.* at 783–84. We concluded that when the properties are reasonably similar and an expert says they are sufficiently comparable for appraisal purposes, the sounder course was to leave dissimilarities to examination and cross-examination rather than exclude the testimony altogether. *Id.* at 784. The mere fact that sales might be considered comparable, however, did not necessarily mean that valuation based on them was credible. *Id.*

4. *Iowa cases where value cannot be readily established by market data.* In several cases, we have noted that a party cannot move to other-factors valuation unless a showing is made that the market value of the property cannot be readily established through market transactions. In *Compiano*, expert witnesses relied on income capitalization to establish value but did not show that there were no comparable market transactions to establish market value. 771 N.W.2d at 398–99. We concluded that this technique amounted to a substitution of a new

approach for that adopted by the legislature. *Id.* at 398. Similarly, in *Carlon*, we held that the burden of persuasion rests on the party seeking to show that market data cannot readily establish market value before proceeding to the other-factors approach to valuation. 572 N.W.2d at 150.

### V. Application of Principles to Wellmark Property.

**A. Whether Market Value Was Not Readily Established.** We begin our discussion with the question of whether the market value of the Wellmark property could not be "readily established" through market analysis. *See* Iowa Code § 441.21(2) (2011). We conclude that in this case, the value of the building simply could not be readily established by a comparable-sales analysis. On the one hand, Wellmark's experts utilized transactions from similar geographic markets, but the transactions involved office buildings dedicated to multitenant use. Further, Wellmark's experts were required to make substantial adjustments with respect to comparable sales in order to support their analysis.

On the other hand, the Board's expert, Korpacz, presented single-occupant sales of large office buildings in large metropolitan areas that are simply not very indicative of the value of property in the much smaller Des Moines market. Further, some of his comparable sales involved property subject to a long-term lease, thus clouding comparability and raising the question of whether the buyer was interested in the property or the income stream generated by an advantageous lease. We therefore conclude that the district court correctly considered other factors in its effort to establish the value of the properties.

**B. Application of Other-Factors Approach.** We now turn our attention to application of the other-factors approach in this case.

On balance, based on our de novo review of the entire record, we conclude that the $99-million valuation of the building is supported by the record. We embrace the view that the property should be valued based on its current use. That is the principle articulated in *Maytag* and *Soifer*, where we valued a large manufacturing concern and a franchised restaurant. In those cases, we resisted efforts by the taxpayers to depart from their current use in the valuation of their property. We decline to employ a use other than current use here as well.

Our approach does not incorporate the value of prohibited intangibles into the appraisal. Although the legislature has prohibited consideration of special value and good will, we have narrowly construed these exceptions. *Soifer*, 759 N.W.2d at 786 n.6. If improvements to a property are not merely valuable to the specific owner but would be of value to others, such improvements should be recognized in the valuation process. As in *Equitable Life*, the office space and improvements on the Wellmark property "could readily be used by any large enterprise desiring to house its home office under one roof." *Equitable Life*, 281 N.W.2d at 825.

It is true, of course, that the market for the Wellmark property for use as a single-tenant office building may be limited. But we think the fact that the property is currently being successfully used as a single-tenant corporate headquarters cannot go unnoticed. Current use is an indicator that there is demand for such a structure. *See Ford Motor*, 10 N.J. Tax at 166–67. While no specific potential buyer has been identified, we do not think there has been a showing of no market, but only of no *active* market. We adopt the view of other jurisdictions that

under the circumstances, value should be based on the presumed existence of a hypothetical buyer at its current use. *CPC Int'l*, 473 A.2d at 552.

Further, we find it ironic that the taxpayer, having expended more than $150 million on its new corporate headquarters, now urges that the property is worth less than half of that amount for tax purposes. As noted by one court, "[g]iven a profit-minded owner with available experience and resources, and a competent builder, the cost of construction is likely to represent the value of the newly-finished product." *Blakely v. Bd. of Assessors*, 462 N.E.2d 278, 283 (Mass. 1984) (quoting *Joseph E. Seagram & Sons, Inc. v. Tax Comm'n*, 238 N.Y.S.2d 228, 234 (App. Div. 1963) (Breitel, J., concurring)). We further note that under the approach advocated by Wellmark, very expensive and costly properties such as large manufacturing concerns could escape fair taxation on the ground of lack of a local market for a specific use.

Based on our de novo review of the record, we conclude that the cost approach provides the best mechanism for determining market value. There is no dispute that the building is appropriate as a corporate headquarters for an insurance company. There is also no dispute that the actual cost of the building was in the neighborhood of $150 million and that there had been very little physical deterioration of the structure as of the date of the assessment. Courts have often applied the cost approach in determining the value of a single-tenant corporate headquarters property when comparable sales were not available. *See Gen. Elec.*, 2005 WL 2081269 at *5; *Aetna Life Ins.*, 2002 WL 377147 at *8; *CPC Int'l*, 473 A.2d at 552; *Beneficial Facilities Corp.*, 11 N.J. Tax at 378; *Freedom Fed. Sav. & Loan*, 801 P.2d at 812–13.

In order to overcome the Board's assessment, we must be convinced that substantial functional obsolescence occurred on the day that the doors of the building opened. As in *Bankers Life*, where the Board valued the property with a twenty-four percent obsolesce factor, we do not think any reasonable depreciation of this new building can bring the value below the $99 million established by the Board. *Bankers Life*, 239 Iowa at 286, 31 N.W.2d at 374.

We recognize, of course, that there is no science in this determination, only judgment based on the record before us. No doubt the potential market participants for a 600,000-square-foot building are limited. Nonetheless, we cannot say that there is no market for corporate-headquarters-type buildings of this size, even if located in Des Moines. A substantial discount in market value because of the lack of an active market strikes us as unjustified by the current record. We therefore agree, based upon our de novo review of the record, with the Board's assessment of $99 million.[3]

## VI. Conclusion.

For the above reasons, the decision of the district court is reversed.

**REVERSED.**

---

[3]Because of our conclusion that the Board met its burden on the valuation question, we need not address whether the testimony of Wellmark's experts shifted the burden of proof to the Board under Iowa Code section 441.21(3)(*b*). For the purposes of this appeal, we assume without deciding that the burden did shift but was satisfied by the Board.