# IN THE SUPREME COURT OF IOWA

No. 20–1290

Submitted September 15, 2022—Filed December 16, 2022

**NATIONWIDE MUTUAL INSURANCE CO.,**

Appellant,

vs.

**POLK COUNTY BOARD OF REVIEW,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.

Property owner Nationwide Mutual Insurance Co. appeals its property tax assessment by the Polk County Board of Review. **DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

McDermott, J., delivered the opinion of the court, in which all participating justices joined. May, J., took no part in the consideration or decision of the case.

Sean P. Moore (argued) of Brown, Winick, Graves, Gross and Baskerville, P.L.C., Des Moines, for appellant.

John P. Sarcone, Polk County Attorney, and Mark Taylor (argued) and Jason Wittgraf, Assistant Polk County Attorneys, for appellee.

**McDERMOTT, Justice.**

This case presents a challenge to a county assessor's valuation for tax purposes of two large corporate office buildings in downtown Des Moines. The assessor set the value of the two buildings at $87,050,000 and $44,910,000, which the properties' owner, Nationwide Mutual Insurance Co. (Nationwide), protested to the Polk County Board of Review (Board). The Board upheld the county assessor's valuation, and Nationwide appealed to the district court. Nationwide and the Board each called two appraisers as expert witnesses. The district court found the Board's experts more reliable than Nationwide's and affirmed the assessment. Nationwide then appealed to this court, and we transferred the case to the court of appeals. The court of appeals reversed the district court's determination about the relative reliability of the expert testimony and reduced the assessments. We granted the Board's application seeking further review.

When valuing real property for tax assessments, the law strives for fairness and uniformity, operating on the notion that similar properties within a given tax classification should be taxed similarly. Because courts reviewing challenges to valuations usually lack technical expertise in appraising commercial real estate, these types of cases often hinge on a factfinder's judgment about conflicting expert witness testimony. And so it goes in this case.

The question before us centers on whether the Board's expert appraisers grounded their opinions in a flawed appraisal method that didn't rely enough on

sales of similar properties and, thus, whether the district court erred by relying on these experts when it affirmed the assessor's valuation.

## I.

The two office buildings at issue—neighboring each other at 1100 Locust Street and 1200 Locust Street—have slightly different histories. The building at 1100 Locust was, in 2002, among the first constructed in what's known as downtown Des Moines's Western Gateway area. In 2006, Nationwide and the City of Des Moines (City) agreed to an expansion project as part of an "urban renewal" development agreement. Under this agreement, Nationwide would expand its building at 1100 Locust and construct another smaller office building at 1200 Locust. In exchange, the City would provide Nationwide about $28 million in economic incentives to help finance the project. Nationwide further agreed that the minimum property values for tax assessment purposes over the next ten years—starting from when the construction projects concluded in 2008—would not fall below $78.5 million for 1100 Locust and $36 million for 1200 Locust. The protested assessments at issue are for tax years 2017 and 2018, and thus within the agreement's ten-year period.

The properties are described with a series of compound adjectives: single-tenant, built-to-suit, owner-occupied, corporate headquarters. The building at 1100 Locust rises seven stories with a gross building area of almost 800,000 square feet, while 1200 Locust stands five stories with a gross building area of almost 372,000 square feet. Nationwide has continued to invest in these properties, partially remodeling both buildings between 2011 and 2016.

The county assessor is generally tasked with valuing the real property in a county for tax assessment purposes. For tax years 2017 and 2018, the Polk County Assessor increased the valuations of both properties, from $80.23 million to $87.05 million for 1100 Locust, and from $41.39 million to $44.91 million for 1200 Locust. An employee from the Polk County Assessor's Office testified that an initial assessment is typically determined using a mass appraisal technique, such as a large study of the sales of commercial-class properties, and then applying a uniform percentage change for properties within that class. An individualized property valuation is prepared only if a property owner files a protest.

And that's what happened here. To arrive at the 2017 valuation, the Polk County Assessor took the 2015 property tax valuations for all commercial-class properties in Des Moines's central business district (such as 1100 Locust and 1200 Locust) and added 8.5%. When Nationwide filed its protest, the assessor performed an individualized "cost" analysis on both properties using a state manual that estimates construction costs if the building were to be constructed anew. After deducting estimated physical depreciation based on the buildings' ages, the assessor arrived at a depreciated value. Because the depreciated value *exceeded* the assessor's earlier valuation, the Board—the body that adjudicates property owner protests (and now the defendant in this case)—determined that no adjustment to the original tax assessment was warranted and thus denied Nationwide's protest.

Nationwide filed a petition for judicial review with the district court. In the district court, Nationwide and the Board each presented testimony from two expert witnesses who had conducted valuations of the properties: for the Board, appraisers Mark Kenney and Russ Manternach; for Nationwide, appraisers Don Vaske and Tom Scaletty. Each expert analyzed the properties using the three valuation methods commonly used to value real property: the "cost" approach, which considers the cost of reproducing the property anew minus depreciation; the "income" approach, which considers the income-producing capacity of the property; and the "comparable-sales" (or simply "sales") approach, which compares the property to other properties with similar characteristics that have recently sold.

But each expert emphasized different approaches—and as to the sales approach in particular, different properties for comparison—in arriving at a "reconciled" value for each property. To give a flavor of the different points of emphasis, Kenney (retained by the Board) provided a single combined appraisal that Nationwide's lawyer worked to unpack into its component parts on cross-examination. Kenney gave less weight to the comparable-sales approach because he found suitable comparison properties lacking in Des Moines or sufficiently similar markets. Kenney also found the income approach ill-fitting.

Manternach (the Board's other expert) gave the least weight to the cost approach because, in his view, the amount of accrued depreciation skewed the valuation too much. In his comparable-sales analysis, Manternach used local properties, but couldn't find suitable single-tenant properties. Manternach

testified that adjusting a sale of an owner-occupied single-tenant building in a larger metropolitan area wouldn't provide a sufficiently objective comparison.

Vaske (retained by Nationwide) testified that in his view the comparable-sales approach offered the most reliable method. He analyzed two properties in Des Moines, one in suburban Kansas City, and one in St. Paul. But Vaske had to make considerable adjustments in analyzing his proposed comparable properties for building age (they weren't as new as Nationwide's) and—most particularly—size, since two of his comparable properties had square footages of only 225,654 and 102,242, while the Nationwide properties are 798,696 and 371,920.

Scaletty (Nationwide's other expert) analyzed but assigned no weight to the cost approach, instead assigning a 60/40 split to the sales and income approaches in his analysis. The local properties that he viewed as comparable sales were not owner-occupied, single-tenant buildings. Scaletty's calculations also made the largest adjustment to the gross square footage available for actual business use, reducing 1100 Locust's 798,696 gross square footage by 15%, down to 669,565 square feet.

As the table below shows, the experts' valuations, including their reconciled final valuations, varied widely:

| 1100 Locust (assessed at $87,050,000) | | | |
|---|---|---|---|
| | Board of Review | | Nationwide | |
| | Manternach | Kenney | Vaske | Scaletty |
| Cost approach | $86,100,000 | $99,000,000 | $54,385,000 | $39,470,000 |
| Sales approach | $81,300,000 | $107,000,000 | $48,237,000 | $39,390,000 |
| Income approach | $82,100,000 | $80,000,000 | $48,117,000 | $39,550,000 |
| Reconciled valuation | $82,100,000 | $94,000,000 | $49,000,000 | $39,450,000 |

| 1200 Locust (assessed at $44,910,000) | | | |
|---|---|---|---|
| | Board of Review | | Nationwide | |
| | Manternach | Kenney | Vaske | Scaletty |
| Cost approach | $44,000,000 | $41,000,000 | $26,650,000 | $23,440,000 |
| Sales approach | $42,800,000 | $63,000,000 | $26,034,000 | $22,640,000 |
| Income approach | $42,900,000 | $55,000,000 | $25,134,000 | $24,240,000 |
| Reconciled valuation | $43,000,000 | $47,000,000 | $26,000,000 | $23,280,000 |

The district court acknowledged that Iowa law requires that county assessors first seek to use a comparable-sales approach in setting a valuation, and that other approaches should be used only when market value cannot be readily determined using the comparable-sales approach. Iowa Code § 441.21(1)(b)(1) (2018). The district court noted that all four expert appraisers incorporated the three traditional approaches in arriving at their reconciled valuation numbers.

Although the district court found Nationwide's experts credible, it found the Board's experts more reliable. The district court thus gave greater weight to the Board's expert valuations, which more closely tracked the county assessor's valuation. In its analysis, the district court discounted the testimony of Nationwide's associate vice president of corporate real estate, who contended that 1100 Locust should not be considered a "corporate headquarters" building. While perhaps technically accurate given that Nationwide's national

headquarters are in Columbus, Ohio, the district court found the testimony unconvincing considering that all four expert witnesses—even Nationwide's—described the properties as single-tenant corporate headquarters, and Nationwide's own agreement with the City called for an "expansion of the regional headquarters for Nationwide."

The district court also noted that, despite's Nationwide's push to set the valuation at the minimum assessment from the parties' agreement, Nationwide never appealed the property tax assessments for 2015, which also landed *above* the minimum. The district court further found persuasive Nationwide's own property insurance coverage that set the replacement cost for 1100 Locust at $148,061,365 and 1200 Locust at $67,804,793—both well above the county assessor's valuations for each property. The district court thus affirmed the Polk County Assessor's original tax valuation of 1100 Locust at $87,050,000 and 1200 Locust at $44,910,000.

Nationwide appealed, arguing that the Board's evidence failed to meet the requirements set out in *Wellmark, Inc. v. Polk County Board of Review*, 875 N.W.2d 667 (Iowa 2016), and, relatedly, that the district court erred in finding the Board's experts more reliable than Nationwide's experts. After we transferred the case, the court of appeals determined that the Board's experts failed to rely on the comparable-sales approach to value the properties as required by statute. The Board thus failed, in the court's view, to support the county assessor's valuation with "competent evidence." Because the court of appeals found that Nationwide's experts, conversely, had properly arrived at their valuations using

the comparable-sales approach, the court reversed the decision of the district court. Rather than remand, the court set the valuations at the agreed minimums (from the 2008 agreement) of $78.5 million for 1100 Locust and $36 million for 1200 Locust.

## II.

Iowa law requires that assessors tax property at its "actual value," which refers to its "fair and reasonable market value." Iowa Code § 441.21(1)(*a*)–(*b*)(1). Market value, in turn, refers to "the fair and reasonable exchange . . . between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property." *Id.* at § 441.21(1)(*b*)(1).

The Code establishes the sales approach as the preferred method of determining valuation, requiring that "[s]ale prices of the property or comparable property in normal transactions reflecting market value, and the probable availability or unavailability of persons interested in purchasing the property, shall be taken into consideration in arriving at its market value." *Id.* We have interpreted this to mean "a party cannot move to other-factors valuation unless a showing is made that the market value of the property cannot be readily established through market transactions." *Wellmark*, 875 N.W.2d at 682. Our cases have repeatedly recited the sales approach's favored status. *See, e.g.*, *Heritage Cablevision v. Bd. of Rev.*, 457 N.W.2d 594, 597 (Iowa 1990); *Bartlett & Co. Grain v. Bd. of Rev.*, 253 N.W.2d 86, 87–88 (Iowa 1977) (en banc).

Despite the Code's preference for the sales approach, valuations using comparable sales alone are not always appropriate. When market value can't be "readily established" using a sales approach, "the assessor may determine the value of the property using the other uniform and recognized appraisal methods." Iowa Code § 441.21(2). These "other" methods include "its productive and earning capacity, if any" (in other words, the income approach) and "its cost, physical and functional depreciation and obsolescence and replacement cost" (in other words, the cost approach), along with "all other factors which would assist in determining the fair and reasonable market value of the property." *Id.*

The taxpayer bears the initial burden of proving that an assessment is incorrect. *Id.* § 441.21(3)(*b*)(1). But if the taxpayer presents "competent evidence" from two or more disinterested witnesses that the property's market value is less than the assessed value, then the burden of proof swings to the assessor. *Id.* In this case, it's undisputed that Nationwide presented competent evidence through its experts to rebut the presumption of validity, thus shifting the burden to the Board to uphold the assessment. *See id.*; *Equitable Life Ins. v. Bd. of Rev.*, 281 N.W.2d 821, 824 (Iowa 1979).

Although acknowledging the burden had shifted to the Board, the court of appeals found that the district court failed in the initial step of the analysis when it determined that the properties' values could *not* be readily established using the sales approach. The assumption that the Board's experts did not present competent evidence because neither *relied* on the sales approach misconstrues

the question of competent evidence. The real question involves a judgment about the persuasive force of the properties tendered by an expert as "comparable."

In some cases, the lines of force between the assessed and comparable properties will be too remote to exert any real pull. When that happens—as the statute contemplates, and as we held in *Wellmark*—using other valuation methods in the analysis is appropriate. "The statutory preference for evaluations based on comparable sales," after all, "applies only to those situations where the value may be readily established by that method alone." *Heritage Cablevision*, 457 N.W.2d at 597.

We review tax protest cases de novo. *Soifer v. Floyd Cnty. Bd. of Rev.*, 759 N.W.2d 775, 782 (Iowa 2009). Although we give weight to the district court's factual findings, we're not bound by them. *Boekeloo v. Bd. of Rev.*, 529 N.W.2d 275, 276 (Iowa 1995). But we are "especially deferential to the court's assessment of the credibility of witnesses." *Wellmark*, 875 N.W.2d at 672.

The district court found that the comparable-sales approach could not readily establish the properties' values, and it thus looked to the other approaches that the experts presented. In finding the Board's experts' opinions more reliable, the district court necessarily adopted the Board's experts' views that the sales approach alone was inadequate to readily establish the market value of the two properties. The district court did so with the benefit of having heard directly the experts' testimony to assess the persuasive force of their valuation opinions. That all the experts used all three approaches in arriving at a valuation could reasonably imply that a property's market value "could *not*

readily be established through the 'sales prices' approach alone but had to be determined by use of the 'other factors' approach." *Equitable Life Ins.*, 281 N.W.2d at 825 (emphasis added). Yet the court of appeals determined that the Board's experts "did not present competent evidence of the value of [the properties]" because they relied too heavily on factors *other* than comparable sales in their analysis.

The court of appeals, in our view, grafted too rigid a standard onto section 441.21. The determination that the Board's experts failed to present competent evidence (because neither relied on the sales approach) misconstrues what the statute refers to as "competent evidence." *See* Iowa Code § 441.21(3)(*b*)(1). In *Compiano v. Board of Review*, we stated that "the production of competent evidence by two disinterested witnesses in tax assessment cases only pertains to shifting the burden of proof." 771 N.W.2d 392, 397 (Iowa 2009). There's no dispute that Nationwide's two expert witnesses fit the bill and that the burden shifted to the Board to uphold the assessments. But the quantum of an expert's reliance on the sales approach as opposed to other factors does not, on its own, determine whether a party has produced competent evidence in a case. *See Wellmark*, 875 N.W.2d at 682.

What's more, simply because an appraiser calculates a valuation using a comparable-sales approach does not mean that this approach *in fact* readily establishes a property's value. We need look no further than our most recent appraisal case for proof. In *Wellmark*, experts for both sides offered valuations using a comparable-sales approach to assess Wellmark's headquarters. *Id.* at

681–82. The experts disagreed, of course, about what properties were truly comparable—the taxpayer's experts used sales from geographic markets similar to Des Moines, but multi-tenant office buildings; the board's experts used sales of single-occupant office buildings, but in large metropolitan areas. *Id.* Yet we found both side's comparable-sales-based valuations unconvincing. *Id.* We reiterated that comparable sales are not strictly limited by geographic area, nor do they need to be identical to the subject property (only similar). *Id.* ("[W]hether properties were sufficiently similar to be comparable was generally left to the sound discretion of the district court."). Because "[t]he value of the building simply could not be readily established by a comparable-sales analysis," we considered other factors to establish the property's value. *Id.*

In our view, the same consideration of "other factors" is necessary in this case. The expert witnesses presented a number of recently sold properties as "comparable sales." But the properties cited in Des Moines, for instance, were multi-tenant office buildings with (as one might expect) varying uses by those multiple tenants, or were not build-to-suit corporate headquarters. The proposed properties that didn't suffer these incongruent characteristics were in substantially dissimilar markets than Des Moines (for instance, suburban Chicago, Kansas City, or St. Paul), thus leaving plenty of doubt about how much weight to afford the other-market sales prices. Ideally, appraisers would find a recent sale in the same geographic region as their subject property of similar size, age, condition, and current use. But this is simply not always possible, particularly with a built-to-suit corporate headquarters. No expert provided

evidence of any sales in the Des Moines area of a large office building to an owner-occupant for that occupant's sole use as a corporate headquarters.

It bears repeating that each expert used all three approaches—income, cost, and comparable-sales—in forming a proposed *reconciled* valuation. "Implicit in this evidence"—referring to expert opinions using all three methods of valuation—"is an assumption by the parties that market value for the property could not readily be established through the 'sales prices' approach alone but had to be determined by use of the 'other factors' approach." *Equitable Life Ins.*, 281 N.W.2d at 825; *see also Wellmark*, 875 N.W.2d at 683 (reciting, with approval, cases using the cost approach to value a single-tenant corporate headquarters when comparable sales were inadequate). None of the experts in this case proposed that the court use *only* a comparable-sales approach to valuing Nationwide's properties. And because comparable sales alone were inadequate, the district court correctly considered "other factors." Iowa Code § 441.21(2) (requiring that "the actual value shall not be determined by use of only one such factor").

We find no basis to reject the district court's determination about the relative reliability of the expert witness testimony or the court's reliance on the reconciled values incorporating other factors in the analysis, and thus hold that the Board met its burden to prove the valuation was not excessive. We affirm the assessments of 1100 Locust at $87,050,000 and 1200 Locust at $44,910,000.

**DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except May, J., who takes no part.