# IN THE COURT OF APPEALS OF IOWA

No. 20-1619
Filed February 16, 2022

**McDERMOTT PROPANE, LLC,**
    Plaintiff-Appellant,

**vs.**

**BOARD OF REVIEW OF DUBUQUE COUNTY,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

A propane distributor appeals a district court ruling affirming the Dubuque County Board of Review's determination that three above-ground fuel storage tanks on its commercial property were taxable under Iowa Code section 427A.1 (2020). **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Timothy N. Lillwitz of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellant.

C.J. May, III, and Emily E. Kremer of the Dubuque County Attorney's Office, Dubuque, for appellee.

Heard by Schumacher, P.J., and Badding, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**BADDING, Judge.**

In this appeal, we must decide whether above-ground fuel storage tanks used as part of a propane distribution system are taxable as real property under Iowa Code section 427A.1 (2020). The district court answered yes, reasoning the tanks had intrinsic value and were integral to the commercial use of the property and therefore subject to taxation as "improvements" or "equipment" under the statute. *See id.* § 427A.1(1)(c), (d). Because the record shows the tanks were not attached to the property under section 427A.1(3), we reverse the district court's ruling and remand with instructions.

## I. *Background Facts and Proceedings*

McDermott Propane, LLC is a wholly-owned subsidiary of McDermott Oil Company,[1] a family-owned company in the business of distributing propane to agricultural, commercial, and residential customers in Dubuque County since 1980. For nearly forty years, McDermott operated out of a bulk plant in rural Cascade, with two 30,000-gallon above-ground fuel storage tanks, two sets of concrete piers and saddles on which the tanks rested, a bulkhead, and a pumping unit. The whole system was interconnected by pipes and ran on electrical power. The tanks themselves were "held in place by gravity" once positioned atop the piers and could be removed by disconnecting the pipes to which they were attached. Those pipes led to the central pumping unit that, in turn, had pipes connecting it to the bulkhead where the company's trucks were loaded for

---

[1] For clarity, we will refer to both companies as McDermott.

distribution. The pumping unit also had connections to the electrical feed, which enabled the propane to flow through the pipes from the tanks to the trucks.

Given the way the operation was set up, the county assessor valued each component of the plant as part of the real estate for property tax purposes and included those values in the yearly assessments without complaint. But it wasn't until after McDermott moved to its present location that the company learned of that practice. In early 2016, McDermott relocated its entire operation to an agricultural property about a mile away from the original site. Before selling the other property, McDermott began to remove the existing tanks, as well as other structural components that it planned to reuse. In the end, only the piers and pipes were left behind.

Upon purchasing the 2.95-acre property at issue, McDermott improved the land by leveling the ground, replacing the dirt surface with gravel and limestone, installing a perimeter fence, and building a shed. Beyond those improvements, much of the operation remained the same. At the start of the installation process, four precast concrete piers and saddles were "set in place" with three-foot-high mounds of lime and dirt fill to serve as the new foundation for the tanks. The next step was to move the tanks using a crane to lift them up and place them onto the saddles. Once the tanks were in place, McDermott installed underground electrical lines that connected to an outside utility pole as well as the pumping unit, which was bolted to a concrete slab in the center of the plant. From there, new pipes were installed, tying each tank to the pumping unit and two concrete bulkheads.

The assessed value of the property as improved by McDermott was $122,110 in 2018. Just a year later, the property was reassessed according to the

Iowa Real Property Appraisal Manual, leading to an increased valuation of $171,920. When asked what parts were included in the assessment, the county assessor reported: "There was no change to the existing real estate that I saw, and so the only change that I made was to add in the information for the new tank that was there." Sometime before the reassessment, McDermott had bought a third tank which, like the others, was positioned atop a set of concrete piers on the property. Because all three tanks were virtually identical, the assessor valued each at $25,000 using the "analyzed unit cost schedule" for 30,000-gallon storage tanks as provided in the manual. He testified the value assigned to each tank also encompassed "the saddles, the concrete piers, foundations that they sit on."

That summer, McDermott petitioned the Dubuque County Board of Review for a modification of the 2019 assessment, arguing the tanks and piers were not "attached" to the property and therefore not assessable for property tax purposes. The board of review denied the protest. McDermott appealed the board's decision to the district court, reprising its argument that the tanks and piers should not have been included in the assessment. *See* Iowa Code § 441.38 (allowing taxpayer to appeal final board of review decision directly to district court). In its petition, McDermott asked the court to reduce the value of the property by $75,000, asserting "[t]he actual value of the Subject Property, if the three fuel tanks are properly excluded, is $96,920, which is a fair assessment."

At an August 2020 hearing, both sides called only one witness to testify. McDermott offered the testimony of its president, who is also the past chair and current board member of a trade association representing fuel marketers and convenience retailers throughout Iowa. Based on his experience in the fuel

industry, he testified it was commonplace to buy and sell used tanks like the ones McDermott owned because they remained operational for many years. Given their long shelf life, he explained that he removed the tanks from the original property before it sold and transported them to the new location. One of those tanks was manufactured "in the '60s and the second one maybe in the '70s," according to McDermott's president. He said moving the tanks was relatively easy and, with help from fewer than ten people, it "took a half a day." The process involved three steps: disconnecting the tanks from the old pipes, hauling the tanks from one site to the other, and using a crane to put them in place. Once situated, the tanks were simply reconnected to new pipes.

The board of review called the county assessor as its only witness. The assessor agreed the tanks could be moved from place to place, but insisted the fact they were movable was not relevant to determining whether they were taxable or exempt under the governing statute. Instead, he offered two reasons why the tanks were included in the assessment:

> First, they are attached by other than an electrical plug-in, electrical connection. The tanks are connected to pipes which are tied in to a hardwired underground electrical feed.
> Secondarily, these tanks have piping that are connected to these loading and unloading points, and those are anchored in concrete and steel posts.

He opined it did not matter how the tanks sat on top of the piers "because the Code says that it doesn't have to be attached." In his view, the statutory language suggested that "if something sits in the ground or on a foundation or if it's connected by an electrical—hard electrical connection and it's not ordinarily removed, then it is to be assessed." As proof tanks of this kind were not ordinarily

removed, he reported that he analyzed sales of Iowa properties with similar tanks that occurred within the past five years and discovered only one out of thirty-nine sales involved the seller removing the tanks from the property. But the assessor conceded that out of all the assessors in the state, only nine replied to his email asking for this information, so his survey was necessarily limited.

After the hearing, the district court denied McDermott's appeal. The court began by noting that McDermott bore the burden of proving the tanks were improperly included in the assessment because it did not offer competent evidence by at least two disinterested witnesses that the market value of the property was less than the market value determined by the assessor, thereby failing to shift the burden of proof to the board of review. *See* Iowa Code § 441.21(3)(b)(1). After placing the burden on McDermott, the court concluded its evidence failed to establish that "the property is not assessable, is exempt from taxes, or is misclassified." *Id.* § 441.37(1)(a)(1)(c). As a result, the court upheld the assessment. McDermott now appeals.

## II. Standard of Review

We review tax assessments de novo. *MC Holdings, L.L.C. v. Davis Cnty. Bd. of Rev.*, 830 N.W.2d 325, 328 (Iowa 2013).

## III. Analysis

### A. Burden of Proof

At the outset, we must address McDermott's claim that the district court erred in failing to find it shifted the burden of proof to the board of review. Section 441.21(3) contains two burden-shifting standards—one for assessment years beginning before January 1, 2018, and one for assessment years beginning

on or after January 1, 2018. Both initially place the burden on the taxpayer "attacking such valuation as excessive, inadequate, inequitable, or capricious" to prove the statutory ground for protest by a preponderance of the evidence. Iowa Code § 441.21(3)(b)(1), (2). And both also allow the taxpayer to shift the burden of proof to "the officials or persons seeking to uphold such valuation to be assessed" if certain criteria is met. *Id.* Relevant here is the distinction between the two possible criteria for burden-shifting in tax assessment cases outlined in the statute.

For "assessment years beginning *before* January 1, 2018," the taxpayer shifts the burden of proof upon presenting "competent evidence *by at least two disinterested witnesses* that the market value of the property is less than the market value determined by the assessor." *Id.* § 441.21(3)(b)(1) (emphasis added). But for "assessment years beginning *on or after* January 1, 2018," section 441.21(3)(b)(2) requires a lesser showing of "competent evidence that the market value of the property is different than the market value determined by the assessor." (Emphasis added.) McDermott contends the district court misstated the applicable burden-shifting framework by requiring competent evidence of value by at least two disinterested witnesses and, as a consequence, did not properly consider whether it shifted the burden of proof to the board of review.

The board of review concedes that the district court should not have applied the pre-January 1, 2018 burden-shifting framework, and we agree. Because McDermott challenges the tax assessment from 2019, the court should have considered this preliminary issue under section 441.21(3)(b)(2), where only competent evidence was required. McDermott asserts it met that lesser showing

through the testimony of its president, which it contends established that the above-ground fuel storage tanks were not subject to taxation as real property under section 427A.1. The board of review counters that the testimony from McDermott's president alone was not competent evidence, citing *Tiffany v. County Board of Review*, 188 N.W.2d 343, 348 (Iowa 1971), for the proposition that "since only the taxpayer testified as to the value of this land, the burden of proof did not shift to the assessing authorities."

We think both parties miss the mark. The board of review because it relies on a case predating the elimination of the "two disinterested witnesses" requirement. And McDermott because its assertion begs the question of what constitutes competent evidence to shift the burden in a tax protest in which the taxpayer challenges whether the property is subject to taxation under section 427A.1. Is it enough for the taxpayer to show the property should not have been included in the assessment, as McDermott contends, or does the taxpayer need to obtain an appraisal using the comparable-sales approach or other appraisal methods listed in section 441.21(2)? *See, e.g., Soifer v. Floyd Cnty. Bd. of Rev.*, 759 N.W.2d 775, 782 (Iowa 2009) (stating that for evidence to be competent, it must comport "with the statutory scheme for property valuation for tax assessment purposes," which requires "that the comparable-sales approach be used unless market value cannot be established under this method," in which case "the property must be assessed using other appraisal methods and other factors" in section 441.21(2)).

In the end, this is a question that can be saved for another day because, on our de novo review of the record, we find McDermott's evidence sufficiently

established the above-ground fuel storage tanks were not assessable as real property under section 427A.1. *See Carlon Co. v. Bd. of Rev.*, 572 N.W.2d 146, 152 (Iowa 1997) ("We need not decide this issue because we find Carlon's evidence sufficiently established the city's valuation was excessive."); *see also Compiano v. Bd. of Rev.*, 771 N.W.2d 392, 397 (Iowa 2009) ("It is a basic tenet that the failure to shift the burden of proof in a tax assessment case is not equivalent to the failure to satisfy the burden of proof."). We now turn to the merits of McDermott's claims.

### B. Assessable Property

The district court determined McDermott's protest failed because the court believed the tanks were improvements or equipment subject to taxation under Iowa Code section 427A.1. Subsection (1) of the statute provides that, "unless otherwise qualified for exemption," the following must be assessed and taxed as real property:

> c. Buildings, structures, or improvements, any of which are constructed on or in the land, attached to the land, or placed upon a foundation whether or not attached to the foundation. . . .
> d. Buildings, structures, equipment, machinery, or improvements, any of which are attached to the buildings, structures, or improvements defined in paragraph "c" of this subsection. . . .

*Id.* § 427A.1(1).

Of those words, the legislature only further defined "attached" as that word appears in both paragraphs. *See id.* § 427A.1(2). Property is "attached" if it is:

> a. Connected by an adhesive preparation.
> b. Connected in a manner so that disconnecting requires the removal of one or more fastening devices, other than electric plugs.
> c. Connected in a manner so that removal requires substantial modification or alteration of the property removed or the property from which it is removed.

*Id.*

Against this backdrop, McDermott asserts the district court erred in two respects: (1) finding the tanks were "improvements . . . placed upon a foundation whether or not attached to the foundation" under section 427A.1(1)(c); and (2) finding the tanks were "equipment . . . attached to the buildings, structures, or improvements" under section 427A.1(1)(d). Because these issues are related, we will address them together.

Although the legislature did not define the terms "improvements" or "equipment," we find guidance in an unpublished opinion of this court cited by both parties, *Wendling Quarries, Inc. v. Property Assessment Appeal Board*, No. 14-0626, 2015 WL 799851, at *5 (Iowa Ct. App. Feb. 25, 2015). In analyzing these provisions, we looked to the plain meaning of the words and determined

> an "improvement" is "an addition to real property, whether permanent or not; esp[ecially] one that increases its value or utility or that enhances its appearance." *Black's Law Dictionary*, 773 (8th ed. 1990). "Equipment" includes "the articles or implements used for a specific purpose or activity." *Id.* at 578.

*Wendling Quarries*, 2015 WL 799851, at *5. Relying on the definitions provided in *Wendling Quarries*, the district court decided the tanks could fit under either one because they had "intrinsic value" and were "McDermott's only use of the property." In reaching that determination, the court recognized section 427A.1(1)(d) required equipment to be "attached" to other property and accordingly concluded the tanks were "attached" by virtue of the piping.

After independently reviewing the record and relevant case law, we reach a different conclusion in both respects. In *Wendling*, we rejected the district court's

categorization of a quarry scale used to weigh mining products as an "improvement" because, while the concrete piers and approach ramps supporting the scale increased the utility of the land and were more or less permanent, the scale standing alone was "a piece of mining equipment that [could] be taken apart and freely bought and sold between mining operations." *Wendling Quarries*, 2015 WL 799851, at *6. For taxation purposes, we distinguished the underpinnings of the scale from the scale itself because only the latter could be "easily disassembled and removed by reversing the assembly process, and leave no damaging impact on the land or the concrete base." Like the scale in *Wendling Quarries*, the tanks here are pieces of equipment that are integral to the propane distribution process yet can be taken apart and separated from the rest of the operation.

In much the same way, the tanks are positioned on top of a concrete foundation, where they are "held in place by gravity" and nothing more. They are connected to two pipes that can be disassembled within a "couple hours" without leaving any damage to the property around it. Once the tanks are removed, they can be transported from one location to another and be reconnected to new pipes in short order. Moreover, just like the scale in *Wendling Quarries*, the undisputed evidence shows the tanks are freely bought and sold within the fuel industry nationwide. McDermott's president testified, "I get e-mails every week from across the country people looking to buy or sell tanks." We find this evidence sufficient to conclude the tanks are more clearly "equipment" under section 427A.1(1)(d) rather than improvements to the land. *See Rose Acre Farms, Inc. v. Bd. of Rev.*, 479 N.W.2d 260, 263 (Iowa 1991). If there is any doubt, we resolve the interpretation issue in favor of the taxpayer. *Id.*

But our analysis does not end there. As noted previously, section 427A.1(1)(d) adds an extra layer for taxability of equipment—that equipment must be "attached" to a building, structure, or improvement on the land. *See id.* So we must decide whether the tanks are "attached" within the meaning of the statute. The parties disagree on which provision governs. According to the board, the tanks are "attached" because the pipes to which they are connected serve as "fastening devices" as that term appears in section 427A.1(2)(b). In contrast, McDermott leaps to section 427A.1(3), which states: "Notwithstanding the definition of 'attached' in subsection 2, property is not 'attached' if it is a kind of property which would ordinarily be removed when the owner of the property moves to another location." Because section 427A.1(3) provides an exception to the attachment requirement as defined in subsection (2), we find it unnecessary to examine what constitutes a "fastening device" in this opinion.

The exception in section 427A.1(3) was explored extensively in *Rose Acre Farms*. 479 N.W.2d at 263–64. In framing the issue, the supreme court noted, "Whether the disputed items are property that would ordinarily be removed when the owner moves to another location is a factual question." *Id.* at 263. It recited several factors for consideration, including whether (1) it was common practice to abandon the property when the owner moves to another location, (2) it was economically advantageous to move the property rather than buy new equipment for the new location, (3) there was a risk of injury in removing the property, (4) a market existed for used equipment like the ones at issue, (5) the dismantling of the property could be accomplished by reversing the process used to assemble it, and (6) the property was built to be movable. *Id.* at 263–64 (internal citations omitted).

Hanging onto that last factor, the board argues "McDermott presented very limited evidence to show tanks like the Subject Tanks were 'made to be movable.'" In arguing the tanks were not made to be movable, the board points to the county assessor's testimony that "most tanks in Iowa . . . remained on the property after the property was sold." We find this argument unpersuasive.

As McDermott correctly notes, the assessor's testimony regarding the sales of properties with similar tanks does not shed light on whether tanks of this kind are ordinarily removed when the owner *moves* to another location. The supreme court stressed in *Rose Acre Farms*, "Section 427A.1(3) contemplates the owner *moving* from the location rather than the owner *selling* the location." *Id.* at 265. Because the assessor's testimony related to owners who had *sold* their properties rather than owners who had *moved* from their properties without taking the tanks, we find it irrelevant to our inquiry.

On the flip side, McDermott offered ample evidence that tanks of this kind are ordinarily removed when the owner moves to another location based on the relevant factors. McDermott's president testified the tanks could be easily removed by reversing the process of connecting them to the pipes. He also testified there was "a whole industry built around" buying and selling used tanks, suggesting the tanks are not often abandoned or thrown away by the owner. Plus, McDermott showed there was no harm or injury to the property when the tanks were moved because they were simply lifted from their place with a crane after the pipes were disconnected. And given the longevity of the tanks, it was economically feasible for McDermott to reuse the existing tanks rather than purchase new ones for the new location.

Based on the foregoing reasons, we find the district court erred in finding the exception in section 427A.1(3) did not apply. The undisputed evidence shows these particular tanks are the kind of equipment ordinarily removed when the owner moves to another location and therefore not subject to taxation. Because the value assigned to the tanks included the foundational concrete piers and saddles, which McDermott now concedes are taxable as "improvements" under section 427A.1(1)(d), we reverse the district court's ruling and remand for a determination of the value of those components and for entry of an order excluding the tanks from the 2019 assessment. *See* Iowa Code § 441.43 (authorizing court to "increase, decrease, or affirm the amount of the assessment appealed from" based on evidence presented at trial); *see also Cablevision Assocs. VI v. Fort Dodge Bd. of Rev.*, 424 N.W.2d 212, 214–15 (Iowa 1988) (stating that if the record is inadequate to determine the value of the property, the court may remand the case for additional evidence to make the determination).

**REVERSED AND REMANDED WITH INSTRUCTIONS.**